The Court took time for advisement; and afterwards in this term their opinion was delivered as follows, by
Parsons, C. J.
Slavery was introduced into this country soon after its first settlement, and was tolerated until the ratification the present constitution. The slave was the property of his master, subject to his orders, and to reasonable correction for misbehavior, was transferable, like a chattel, by gift or sale, and was assets in the hands of his executor or administrator. If the master was guilty of a cruel or unreasonable castigation of his slave, he was liable to be punished for the breach of the peace ; and I believe the [*128] slave was * allowed to demand sureties of the peace against a violent and barbarous master, which generally caused a sale to another master. And the issue of the female slave, according to the maxim of the civil law, was the property of her master. Under these regulations, the treatment of slaves was in general mild and humane, and they suffered hardships not greater than hired servants.
Slaves were sometimes permitted to enjoy some privileges as a peculium, with the profits of which they were enabled to purchase their manumission, and liberty was frequently granted to a faithful slave, by the bounty of the master, sometimes in his life, but more commonly by his last will. Several negroes, born in this country, of imported slaves, demanded their freedom of their masters by suit at law, and obtained it by a judgment of court. The defence of the master was faintly made, for such was the temper of the times, that a restless, discontented slave was worth little; and when his freedom was obtained, in a course of legal proceedings, the master was not holden for his future support, if he became poor.
But in the first action involving the right of the master, which came before the Supreme Judicial Court, after the establishment of *119 the constitution, the judges declared, that, by virtue of the first article of the declaration of rights, slavery in this state was no more. And afterwards, in an action † by * the inhab- [ * 129 ] itants of Littleton, brought to recover the expenses of maintaining a negro, against Tuttle, his former reputed master, tried in Middlesex, October term, 1796, the Chief Justice, in directing the jury, slated, as the unanimous opinion of the Court, that a negro born in the state before the present constitution, was born free, although born of a female slave. It is, however, very certain that the general practice, and common usage, had been opposed to this opinion.'
From this brief view of the state and condition of a slave, it is manifest that the master was obliged to support him, and was entitled to all his services. The slave, therefore, could not acquire a settlement in his own right. But he might, through age or disease, become useless, when the property of a master, who was a pauper In this case, his maintenance would devolve on some town, and some settlement must be assigned to him, to designate the town subject to the burden. He had, consequently, a derivative settlement from his master, and whenever the master acquired a new settlement, it was accompanied by the settlement of the slave, who could not be separated from his master. In this respect, the condition of a slave resembled the connection of a wife with her husband, and of infant children with their father. He is obliged to maintain them, and they cannot be separated from him. Thus their settlement is derived from the husband and father.
*120 A reasonable conclusion from these facts is, that slaves were not within the nintli and tenth sections of the statute of 4 W. and M., or the 12 and 13 Will. 3, c. 10, making the warning out of persons, within the year, necessary to prevent a settlement; nor within the statutes of 10 Geo. 2, c. 3, and 13 Geo. 2, c. 1, which direct every inhabitant of a town, receiving an inmate, boarder, or tenant, to give notice to the selectmen; and that slaves are not within the fourth section of the statute of 7 Geo. 3, c. 3; which provides that no settlement shall be gained by residence, as that section extends only to persons who were competent to gain a settlement by residence, if not warned out.
To this construction it is objected, that the statute of 2 Anne, c. 2, considers slaves as gaining a settlement by residence, [ * 130 ] * because a master of a manumitted slave must indemnify the town where he lives. The language of this statute is adapted to the cases which most frequently, if not always, happened. A practice was prevailing to manumit aged or infirm slaves, to relieve the master from the charge of supporting them. To prevent this practice, the act was passed. The design of it was, to hold the master answerable for the maintenance of the slave, if the manumission was without indemnity. As slaves were rarely, if ever, manumitted, until after a long course of service, probably it never happened that they acquired their liberty until after a year’s residence in the town in which they were manumitted. And when they became free, they might gain a settlement in their own- right, by a year’s residence, unless warned. The town wherein they were manumitted, was the proper town to be indemnified, for there only could they acquire a settlement against the will of the inhabitants, as, having lived there a year, they could not be the subject of warning.
The law must now be applied to the facts stated. The inhabitants of Winchendon allege that the pauper, Edom London, has his legal settlement in Hatfield.
It is stated that the pauper was once the slave of Oliver Partridge, living several years with him in Hatfield, where his master was settled. The pauper then acquired a derivative settlement in Hatfield. Afterwards, his master, Partridge, sold him to J. Ingersoll, Esq., an inhabitant of, and settled in Westfield. There he lived several years with his new master; and there he lost his settlement in Hatfield, by gaining a new derivative settlement in Westfield. As it is not stated that the pauper, at any time after-wards, again lived in Hatfield, either as a slave or freeman, it is unnecessary to pursue the cgse further. Having lost his settlement in Hatfield, and not having regained a new settlement the re, the de *121 fendants in error are not liable for his maintenance; and the judgment must be affirmed with costs.

 Littleton vs. Tuttle.
This was an action of assumpsit for 71. money expended by the plaintiffs for the support and maintenance of Jacob, alias Cato, a negro and a pauper.
Upon the general issue pleaded, the following facts were proved to the jury. Cato's father, named Scipio, was reputed a negro slave when Cato was born, and, according to the then general usage and opinion, was the property of Jfuthan Chase, an inhabitant of Littleton. Cato’s mother, named Violet, was a negro in the same reputed condition, and supposed to be the property of Joseph Harwood. Scipio and Violet were lawfully married, and had issue Cato, born in Littleton, January 18th, 1773, and was then, in the general opinion, a slave, the property of the said Harwood, as the owner of his mother. Harwood, on the 17th of February, 1779, sold him to the defendant, who retained him in his service until he was 21 years old. He being then a cripple, and unable to labor, the defendant delivered him to the overseers of the poor of Little-ton. and left him with them, refusing to make any provision for him; whereupon the overseers expended the money in his maintenance, for which this action was brought.
The Court stopped the defendant’s counsel from replying, and the Chief Justice charged the jury, as the unanimous opinion of the Court, that Cato, being born in this country, was born free; and that the defendant was not chargeable for his support after he was 21 years of age. And the jury found a verdict accordingly, without going off the stand
Sullivan (Mtorney- General) for the plaintiffs.
Bigelow for the defendant.