Parker, C. J.
The facts agreed in this case show, that the pauper, Lewis Elisha, was born in that part of Stoughton now Canton; that his father was, at the time of Lewis’s birth, and long before, a negro slave of a Mr. Wentworth, living and having a legal settlement in the same part of Stoughton ; that the father continued to be held in slavery until his death in 1780. The mother of Lewis was the daughter of an Indian of the Punkapog tribe, which tribe occupied lands and resided within the limit! of Canton, and of a white woman, and was married to Caesar, the father of Lewis, in 1769. Whether her said father and mother were married or not does not appear ; nor is it material to our decisicn of the action. There is no doubt that she was a mulatto, within the meaning of the legislative acts providing for the care of this tribe *>f Indians, and of those who mixed with them.
* By several legislative acts, the Punkapog tribe of Indians, and their lands, were placed under a kind of guardianship of certain agents of the government, who took care of them and of the property supposed to belong to them, bound them out to service, and otherwise employed them, and rendered an account of their services and expenses to the government. Mulattoes, also, of that tribe, by which was undoubtedly meant those of whom one of the parents belonged to the tribe, were treated as Indians by the government, and placed under the same guardianship.
Lewis Elisha left Canton in 1788, or 1789, and never returned ; and in 1803 married Hannah Richardson, who had her settlement in Andover or Boxford before her marriage.
The question upon these facts is, whether Lewis has a settlement in Canton; and, if so, whether his wife and children acquired a settlement there, through him.
As between the years 1767 and 1789 there was no mode of acquiring a new settlement, but by approbation of the inhabitants of the town into which the person might remove ; and as Lewis had left Canton in the year 1789, without ever having obtained such approbation ; it is clear that be has no legal settlement there, unless his birth gave it to him, or unless he derived it from his father, or his mother.
With respect to his birth, although bv the common law of England it gave a settlement, yet, after the passing of the provincial act of 7 Geo. 3, in the year 1767, it has been held ro have had no such effect here. It is so stated by Chief Justice Parsons, in the case *438 of The Inhabitants of Chelsea vs. The Inhabitants of Malden ; (4) and the reason probably is, that, from the whole tenor of that act, it is clearly to be inferred, as the sense of the legislature, that nothing Out the acceptance of a stranger by the inhabitants should burden such town with his support.
Did Lewis, then, derive a settlement in Canton from his father, Caesar ? At the time of bis birth, Caesar was a * slave, and, as such, was the property of his master, as much as his ox or his horse ; he had no civil rights but that of protection from cruelty ; he could acquire no property, nor dispose of any, without the consent of his master. His settlement in the town with his master was not for his benefit, but to ascertain what corporation should be charged with his maintenance, in case his master should become unable to support him, or should die, leaving him a charge to the community. We think he had not the capacity to communicate a civil relation to his children, which he did not enjoy himself, except as the property of his master.
His children, if the issue of á marriage with a slave, would imme diately on their birth become the property of his master, or of the master of the female slave. According to the common law of England, they would be the property of the master of the husband ; the rule of the civil law, partus sequitur ventrera, not having been adopted with respect to the human species. For, if a villein married a free woman, the issue of the marriage was a slave ; and, on the contrary, if a free man married a neife or female villein, the issue of such marriage would be free. (5) In this country, however, it seems, that the issue of a female slave was the property of her mas ter ; at least, such was the opinion of Chief Justice Parsons, in the case of The Inhabitants of Winchendon vs. The Inhabitants of Hatfield. (6)
It may certainly be doubted,, however, whether Lewis was born in slavery ; for his mother was free, being the daughter of an Indian and a white woman, both of whom were free. And although, by the doctrine of the common law applicable to villeins and their issue, he would be considered a slave ; yet, as slavery was but tolerated, and not favored, in this country, and as the whole feudal system had been abolished by our ancestors in both countries, it is not probable that a principle, so unfavorable to personal liberty, would have been applied here. Indeed, we -find the Court, early after the adoption of our Constitution, * deciding, not only that slavery was virtually abolished by that Constitution, but that the issue of two slaves, born in wedlock in the year 1773, was born free ; probably upon the principle, that, although slaves acquired in a *439 foreign country might remain bound during their lives ; yet, that, in a free country, they could not transmit their slavery to their posterity. This was settled in the case of The Inhabitants of Littleton vs. Tuttle. (7)
The practice, however, was, as suggested by Chief Justice Parsons, in his comments upon that case, to consider such issue as slaves, and the property of the master of the parents, liable to be sold and transferred like other chattels, and as assets in the hands of executors and administrators.
But we think there is no doubt, that, at any period of our history, the issue of a slave husband and a free wife would have been declared free. So that Lewis never did become the property of his father’s master; and so did not obtain a settlement through him as a slave. Nor can we conceive that his father, who, in consequence of his state of slavery, could have bad no control over the person of his child, could communicate a settlement to him, which he never bad himself, except as the property of his master.
In the case of The Inhabitants of Shelburne vs. The Inhabitants of Greenfield, decided in the Supreme Judicial Court at Northampton, in the year 1796, a manuscript copy of which was produced by Mr. Dane, at the argument, it would seem, that the children of two negro slaves were considered to have their settlement in the latter town, because their parents had a settlement there under their master ; although the parents were married, and their children born, in Shelburne. But we find no reasons given for that decision ; and it cannot, therefore, weigh against the strong reasons which offer in 'favor of a contrary opinion.
Had Ccesar lived until he was free, and then married, he would have communicated the settlement derived from * his master to his children ; who in such case would have been born after he became free ; as was decided in the case of Dighton vs. Freetown. But he died while in slavery, and was never capable of gaining a new settlement for himself, or transmitting any to his children.
In the case last mentioned, a doubt was thrown out, which may be considered as intimating the opinion of the Court, that a slave husband could not communicate his settlement to his wife. If so, certainly for the same reason he could not to his children. For the foundation of derivative settlements is the right to control the person ; which right could never be enjoyed by one held in absolute slavery.
For these reasons, we think that Lewis derived no settlement in Canton from his father; and it is equally clear that he could derive none from his mother. For the mother communicates a settlement *440 only to illegitimate children. Besides, nothing in the case shows, that Abigail Moho, the mother, was herself lawfully settled in Canton. She was the daughter of an Indian and a white woman. This made her a mulatto, within the terms of the legislative act of 1763, which provided for the guardianship of the mulatto children of the Punkapog tribe of Indians, and gave authority to bind them out at service.
It is to be presumed from the case, that she continued with that tribe ; and, therefore, although she might perhaps have asserted her freedom from restraint, and have left the tribe as her son Lewis did, yet, while she continued subject to the regulations established for that tribe, she could not be considered as having any municipal relation to the inhabitants of Canton ; and it is immaterial, whether she was a mulatto or not, provided she associated with the tribe, making one of their number.
It is not an admissible idea, that a tribe of Indians, of whom the legislature had assumed the guardianship, whose land or other property is taken into public custody, and even whose labor is disposed of, without consulting the * inhabitants of the town within which they may dwell, should become chargeable to the town, in case of poverty, merely because they lived within its limits.
There is always supposed to be a consideration, past or present, for the obligations of towns to rest upon, in the support of paupers. They have received some benefit from their property, or that of their ancestors, by taxation or otherwise ; and they may dispose of them in service. But with respect to this tribe of Indians, the town of Canton could never have received a benefit in any way, having no right to tax their property or their polls, or to diminish the expense of supporting them by placing them out at service.
The mother of Lewis, therefore, was not settled in Canton, in consequence of living within its limits ; nor did Lewis himself gain a settlement by belonging to the tribe, for the same reasons ; and because, also, he had a right to leave the tribe, and did leave it, and did, in fact, become a free citizen, capable of gaining a settlement for himself under our present laws. Whether he has, in fact, gained a settlement in any other town, we need not now inquire ; it being enough for the decision of this cause, that he had not gained one in Canton.
Probably the legislature will consider the remaining tribes and parts of tribes of aboriginals, which yet remain within the confines of this Commonwealth, as the unfortunate children of the public, entitled tc protection and support, when their means of subsistence fail, anc when it shall be found that they are incapable of civilization, so fa' as to be admitted as citizens.
*441 Such seem to have been the humane views of the successive legislatures of the Colony, Province, and Commonwealth ; they having, at various times, empowered agents to take care of the lands which were allowed to be the property of native Indians, and, in several instances, having provided means for their support, comfort, and instruction. It certainly would be more worthy of the liberal * character of this Commonwealth, to make a general and permanent provision for the maintenance of such of the tribes, or individuals of the tribes, as shall be brought to indigence, than to throw the unequal burden upon the towns where they may have chiefly resided •; those towns not only never having derived any benefit from their labor or property, but, on the contrary, having generally suffered disadvantage from having considerable landed property exempted from taxation, and from the unsettled habits and manners of such a population.
Whether the town of Andover will have relief from the Commonwealth for the expense incurred in the support of these paupers must be submitted to the wisdom and justice of the legislature to decide.
It has become unnecessary to decide upon the sufficiency of the notice given, in this case, by the overseers of Andover to the overseers of Canton, as applicable to the wife and children of Lewis; because, he having no settlement himself, bis family can derive none from him. But it may save trouble and expense in other cases to remark, that, in the case of The Inhabitants of Embden vs. The Inhabitants of Augusta, (8) it was decided, that notice that the family of a person named bad become chargeable was insufficient. In the case at bar, the notice was still more deficient; it being confined entirely to the situation of Lewis himself, without an intimation that he had any family.†

Plaintiffs nonsuit.

[As to notice, see Rev. Stat c. 46, § § 18-21. — Ed.]

 4 Mass. Rep. 131.

 2 Black. Comm. 94, 390.

4F"> 4 Mass. Rep. 123.

 4 Mass. Rep 128, note.

 12 Mass. Rep. 307.

 See The Inhabitants of Shutesbury vs. The Inhabitants of Oxford, 16 Mass. Rep. 102, as to what constitutes a waiver of notice.