Nevixjs, J.
This proceeding is designed to present for our adjudication the question, whether slavery can exist within the limits of this state under its present constitution and laws ; and it derives signal and solemn importance from its bearing upon a class of human beings, still claimed to be lawfully held in slavery, and upon the interest of those communities where most of that class are still found. I have listened with great pleasure and deep interest to the arguments and remarks and the pathetic appeals, which have been urged before us, in support of this demurrer, and in behalf of the colored race; and whilst I most sincerely respect the zeal and humane spirit by which they were dictated, and the ingenuity, talents and research of the counsel, I am nevertheless constrained to say, that much of the argument seemed rather addressed to the feelings than to the legal intelligence of the court.
The first inquiry which the subject presents for our consideration is : Has the relation of master and slave, or has the institution of slavery ever existed by law in the State of New Jersey ? And if it has: Has it ever been abolished by constitutional or legislative enactment ? Slavery either in its most absolute or more- *370 qualified form, as it existed in ancient times and among other nations, or in modern times in our own, is too well understood to render it necessary to define it; nor does the present case require that I should enter upon a disquisition as to its origin, its history, its abuse, or the principles .upon which it has been attempted to be sustained and justified. Our duty will be to inquire only, whether it has ever legally existed here, and still has such legal existence, for it is the law of the case we are called upon to pronounce. The court has no power to enact a law, nor to set aside a law, even to remedy what we may consider a great private or public wrong or to remove a great political evil; that power belongs to another department of the government. We can only declare what the law is, and whether consistent with the law of God, and the fundamental or constitutional law of society.
The legislative records of the State from the earliest period to which we can refer, prior to the revolution, as well as subsequent to that event, prove not only that slavery existed'and was tolerated, but that it was recognized and treated as a legal institution. The master’s claim of property in his slave, his power and authority over him, to direct and restrain, to sell and transfer him to another, have been, by repeated acts both of the colonial and state governments, again and again recognized, protected, defined and regulated. In proof of this, I refer to the grants and concessions in Lord Carteret’s time, as early as 1 664. To the colonial act of 1682, requiring masters to allow negro slaves sufficient accommodation of victuals and clothing; to the act, of about the same period, imposing penalties on persons trading with negro slaves ; to the act of 1694, prohibiting slaves from carrying fire arms; to the instructions to Lord'Cornbury in 1702; to the act of 1.713, for regulating slaves, wherein among other things it is enacted that no slave shall be manumitted, without security from the master to contribute annually for his support £20 during life ; to the act of 1751 to prevent landlords selling liquor to slaves, and to prohibit them from going out at night, except to attend public worship or funerals ; to the act of 1760, imposing penalties on slavesffior setting traps; to the act of 1768, prescribing the ■mode of trying slaves for certain offences ; and to the act of 1769 *371 laying duties on imported slaves. These several acts establish most incontestibly, that whilst we were yet a colony of Great Britain, the relation of master and slave existed here, was tolerated, recognized, sanctioned and regulated by law.
After we became an independent government and in the year 1798, the legislature by statute declared, that every negro who was then a slave, should remain so for life; unless manumitted in the mode prescribed by that statute. This latter act was a general one on the subject of negro slavery, and repealed most if not all the former enactments on that subject. The judicial records too of this state confirm the position, that under the laws already referred to, slavery had a legal existence here, both before and after the revolution. It is not necessary to cite with particularity the adjudications of this court to prove the truth of the remark; nearly every volume of reports, from the organization of the present, government to this time, abounds in cases, recognizing the right of the master over his slave. How far these laws have been wise, politic, or just; or how far they are consistent with principles of humanity and natural and inherent right, it is not our pro'viuce, nor are we now called upon to decide.
In 1804, the legislature adopted a plan for the gradual abolition of slavery, and passed an act declaring, “ That every child born of a slave, after the 4th of July of that year, should be free, but remain the servant of the owner of the mother, his executors, administrators or assigns, until he or she Should arrive at a specified age.” This act did not interfere with or disturb the relation between the master and slave, except so far as regarded the right of the former to the future offspring of the latter. This law was re-enacted in 1820, with many additional provisions, not necessary here to notice; for none of them interfered with the owner’s right to the person and services of such as were then held as slaves, but left that relation with all its rights and correspondent legal obligations. Under the operation of these last mentioned laws and the benign spirit of the age, which inclined men to manumit their slaves, slavery has become nearly extinct in this state and must soon pass entirely away. By the census of 1810, the number of slaves, then in the state, was 10,851; which, ac *372 cording to the last census, was reduced to 674; of whom 325 were under, and 349 over the age of fifty-five years. Those who yet survive and have not been manumitted, remain still the slaves of their masters.; but have a legal claim upon the latter for maintenance, in case of their inability to support themselves, unless by the provisions of the new constitution framed and adopted in 1844, slavery is absolutely abolished. If such be the case, it will follow as a legal consequence, that masters too, are absolved from the obligation of maintenance. It will be seen therefore, that the question involved in this case is one of general application to the whole class of persons, who are still claimed as slaves, and of especial interest to those communities, where most of them reside. These consequences, while they can have no legitimate influence upon the decision of the question, nevertheless give it more than ordinary importance, and call for our most serious and anxious consideration.
I think it sufficiently manifest, that when the new constitution came into operation, slavery existed by law in this state. Has that instrument either by express enactment or clear and necessary implication abolished it? The 1st section of the first article on rights and privileges declares, that “all men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.” Under this general, and I may call it, abstract proposition, the precise meaning and extent of which it is somewhat difficult clearly to comprehend, it is contended that slavery is abrogated and all laws established regulating or modifying it, as they are repugnant to the tenor of the proposition, are repealed by it; and all rights, arising out of or founded upon such laws, are taken away. Whilst on the part of the defendant it is insisted that no such conclusion can be legally drawn from the proposition; but that it is clearly repelled, by that other section of the same instrument, which declares in the form of enactment, “That all writs, actions, claims and rights of individuals and bodies corporate shall continue as if no change had taken place.” That as the right of property, which the defendant had in the person and to the services of the colored man *373 William as his slave, when this constitution was framed and adopted, was a clearly established legal right, it is not impaired or taken away ; but by the express words and true spirit of the constitution is reserved to and continued in him.
To determine the true meauing of any part of the constitution, we are first to examine with care the language used to convey that meaning, and interpret it according to its natural and ordinary use and acceptation. If it is plain, explicit and consistent, we ought not to resort, either to the journal or debates of the convention, or the private opinion or understanding of any of its members, for the purpose of finding a different meaning from what the language naturally conveys. If the terms used are ambiguous, or of doubtful signification, or if they are used in such connection as renders their import uncertain, it is a well settled rule that resort may be had to other parts of the same instrument to determine their true construction.
We will in the first place endeavor to discover, if we can, from the language of the first section of the bill of rights, what was intended by the framers of the constitution and the people, who adopted it. I have said that it contains a proposition, which does not convey to my own mind any very clear or definite meaning. There is less difficulty however in defining the terms used, than to comprehend their full meaning, in the connection in which they are used, or to acquiesce in the broad truth they seem designed to declare. If the convention intended to say, that all men in a state of nature are free and independent, they only ascribe to man what may with the same propriety be ascribed to all other animals, in a like state, for they are equally free and independent, and with man have equal right to pursue their own safety and happiness and acquire and protect their own possessions; and their instinct leads them to exercise that right. But the freedom and independence, which is ascribed to man, even in a state of nature, is to be taken in a very limited sense; for in such a state the strong will encroach upon the weak, and it ever will be so, whilst man bears his corrupt nature. It is only a universal sense of justice, and a disposition among all men to exercise it, that will secure freedom and independence and the enjoyment of the enumerated natural rights of individuals, in a state of nature.
*374 If the convention intended to say that all men, in a state of civil or political society, were free and independent and entitled to the exercise and enjoyment of the rights mentioned, the expression must be understood in a modified sense according to the nature, the condition and laws of the society to which they belong. For man, under no form of government, can be said to be absolutely free and independent, and have the absolute and uncontrollable right over his own actions, according to his own free will, unrestrained by the rights of others and the laws of the government, under which he lives. Authority and subordination are essential under every form of civil society, and one of its leading principles is that the citizen yields to it a portion of his natural rights, for the better protection of the remainder. In such a state, man’s, right to freedom and independence, to enjoy and defend life and liberty, to acquire, possess and protect property, and to pursue and obtain safety and happiness, are ever subject to, and regulated by, laws fundamental or otherwise, which the majority of the people in a republic, have established for their government. It is true that in a republican government, those laws, which define, limit and regulate the exercise of these natural rights, may be esteemed as enacted by the people themselves, and therefore that the voluntary assent of every individual is expressly or impliedly given to them ; and of consequence that men exercise and enjoy these rights, according to their own free will. Whilst under a despotic, or even a monarchical government, those natural rights may be restrained or wholly taken away by ■the mere will or caprice or interest of the despot or monarch. It was in reference to the form of government, which the people of this country were about to establish at the revolution, that this language was. first used and was substantially adopted afterwards by the people of several other states in the formation of their fundamental law; and I apprehend it was in reference to the same subject, that this language was used in the section we are considering. In framing this fundamental law, the convention set out with the general proposition, that men in their social state are free to adopt their own form of government and enact their own* laws; that they are independent of all foreign societies or government, and of the will of any one man or set of men ; that in *375 framing their laws, they have a right to consult their safety and happiness, whether in the protection of life and liberty, or the acquisition of property. 1 take it, the framers of the constitution never designed to apply this language to man in his private, individual or domestic capacity; or to define his individual rights or interfere with his domestic relations, or his individual condition. It is spoken of men in their social state, and is nothing more than the expression of an opinion of their political rights, not reduced nor intended to be reduced to tbe form of an enactment either of command or prohibition. And as far as this opinion is reduced to the form of enactment by subsequent clauses of the constitution, in defining and limiting rights and powers, and imposing restraints and obligations, so far it is binding and no farther. Had the convention intended to abolish slavery and domestic relations, well known to exist in this state and to be established by law, and to divest the master of his right of property in his slave and the slave of his right to protection and support from the master, no one can doubt but that it would have adopted some clear and definite provision to effect it, and not have left so important and grave a question, involving such extensive consequences, to depend upon the doubtful construction of an indefinite abstract political proposition. The first two sections of the article on rights and privileges contain mere opinions, without anything in the nature or form of enactment; the first is the one we have been considering, and the second declares that all political power is inherent in the people, and that government is instituted for their protection, security and benefit. If my construction of the first of these is right, it would seem that the second was designed as a corollary to it, and both intended only as a preamble to the other sections, all of which are in the form of command or prohibition.
The declaration of independence, the basis of our free government, declares that all men are created free and equal, and the constitution of the United States proclaims that the people have formed it to secure the blessings of liberty to themselves and their posterity ; yet by the express language of the latter instrument, the relation of master and slave is recognized ; showing that the framers of that constitution did not deem their general declaration in favor of liberty, incompatible with its other provisions; and *376 it has never been judicially determined that slavery, in the United States, was thereby abrogated. On the contrary it has been often adjudged, both by the State and Federal courts, that slavery still exists; that the master’s right of property in the slave has not been affected either by the declaration of independence, or the constitution of the United States. The right to seize and capture, transport to this country, sell and subject to bondage the native African was not only tolerated, but adjudged lawful, long after the adoption of the constitution, and was only abolished by special act of congress. It was argued before us, that, under the declaration of rights in the constitution of Massachusetts, which contains the-same language, it has been judicially held, that slavery was no more. And we are referred to the case of Winchendon v. Hatfield, 4 Mass. R. 123; and Commonwealth v. Ives, 18 Pick. R. 193. The former of these cases involved a question as to the settlement of a negro man, named Edom, but not the question as to the effect of the declaration of rights upon slavery. Hence it did not become necessary for the court to express any opinion on that question. Chief Justice Parsons, however, in delivering the opinion of the court took occasion to remark, “That in the first action involving the right of the master, which came before the supreme judicial tribunal after the establishment of the constitution, the judges declared that, by virtue of the first article of the declaration of rights, slavery was no more.” And he also referred to another case tried in 1796, where the like doctrine was held. While he expresses no opinion, either of approval or disapproval of these decisions, he says, “ It is certain the general practice and common usage had been opposed to the opinion.” He further remarks, “ That in controversies between master and slave for the freedom of the latter, the defence of the master was faintly made, for such was the temper of the times, that a restless, discontented slave was worth little, and when his freedom was obtained, in a course of legal proceedings, the master was not holden for his future support, in case he became poor.”
In the case in Pickering, Chief Justice Shaw declares “ that slavery is contrary to natural right, to the principles ofjusticeand humanity, and repugnant to the constitution.” I am unwilling to *377 yield to any one, in high respect for the supreme judicial tribunal of that enlightened state; but as far as I have been able to examine these cases, I do not find the reason or argument, which satisfies my mind of the soundness of its conclusion. It does not appear, that that very able jurist Chief Justice Parsons ever expressed an opinion as to the effect of the bill of rights upon the, question of slavery; nor does it appear, in the cases referred to by him, who were the judges, who did express such an opinion, or upon what reasons it was based. How far the humane spirit of abolitionism, which prevailed in that state, the fewness or worthlessness of that species of property, the feebleness of the defence made by masters, or the collateral mode in which the question was presented, or the fact that slavery had only been tolerated, but never actually established by law, may have influenced the opinion of the courts in the cases referred to, [ will not undertake to determine. By this remark I mean to cast no imputation upon the judicial intelligence or integrity of that court; but judges must be more than men, if they can always escape the influence of a strong popular opinion of society upon great questions of state policy and human benevolence, which have been long agitated and much discussed ; audit is no matter of surprise that Chief Justice Shaw, entertaining the opinions he did upon this question of slavery, should have found it repugnant to the spirit of their constitution.
In dissenting therefore from the Massachusetts cases, I must not be understood as wanting in that courtesy and respect for that elevated tribunal, to which it is so justly entitled ; and I have too the consolation to find, that I am not without support in withholding that assent. The constitution of Virginia contains a clause substantially like the one in our own, which we have been considering. The question of slavery and the master’s right, under the laws and constitution of that state, have often been the subject of adjudication, both in the state courts of that state and in tiie Federal Courts, yet no court has ever yet adjudged that the constitution of that state had abolished slavery.
Upon the best consideration I have been able to bestow upon the case before us, I am of opinion,
*378 First, That the relation of master and slave existed by law, at the adoption of the constitution in 1844.
Secondly, That the constitution has not destroyed that relation, or abolished slavety.
Thirdly, That the colored man William should be remanded to the custody of the defendant, and for similar reasons I think a like order should be made in the case of The State v. Van Beuren ; which is the case of a colored apprentice, under the act of 1820, for the gradual abolition of slavery.
Randolph, J.
On the 15th of February, 1804, the Legislature of New Jersey passed the “ act for the gradual abolition of slavery ;” which provided, that every child born of a slave, within this state, after the 4th of July, then next ensuing, should be free, but remain a servant, in the same manner as if bound to service by the trustees or overseers of the poor; the service to continue, if a male, until twenty-five, and if a female, until twenty-one years of age. This act, though repealed by the act of February 24, 1820, is substantially re-enacted by that statute; and, unless abrogated by the constitution, is in full force ; as is also the “ act respecting slaves,” passed March 14th, 1798, the first section of which provides, that, “every negro, Indian, mulatto or mestee within this State, who, at the time of passing the act, is a slave for his or her life, shall continue such during his or her life, unless he or she shall be manumitted or set free, in the manner prescribed by law.” Under the impression that the constitution, recently adopted, abolishes all slavery in New Jersey, and the involuntary servitude or apprenticeship of the children of slaves, these writs of habeas corpus have been sued out, and returned to this court; the one bringing up a slave born previous to the 4th of July, 1804, and the other, a servant or apprentice under the act, being the child of a slave and born since that period. The object is to test the effect of the new constitution in these two classes of cases. The first clause in the constitution reads as follows : “ All men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and *379 protecting property, and of pursuing, and obtaining safety and happiness.”
In coming to a just understanding of this clause, its position must first be considered. It is not necessarily a portion of the constitution, properly so called; but merely the first section of the bill of rights, or preamble to that instrument. Perhaps the most perfect of all written constitutions, is that of the United States, yet that has no bill of rights; and although objections were made on that account previous to its adoption, yet it has answered its wise purpose for half a century, without that appendage. It is true, some of the old constitutions have it, yet many of modern date are without it; and those, who are familiar with the history of the present State constitution, know the little interest (hat was felt generally in the convention, respecting the bill of rights, and how a large portion of the members, considered it of small importance; but in the spirit with which the convention assembled, and out of respect to the opinions of those who considered such a prefix necessary, a committee was appointed on the subject, and a bill reported, and with a few amendments adopted.
Yet strictly speaking, it is but a preamble, setting forth the reasons or the principles on which the following instrument is based ; though in some instances, as in the clause respecting imprisonment for debt, which was an amendment to the original report, assuming a mandatory character. The first clause, however, which is that now under consideración, as well as the clause following, have no such feature; they seem to make a kind of preface of general abstract principles for the whole; arid so far as political action is concerned, the constitution would have been perfect without them. They intend generally to assert the principles on which men, in a state of nature enter into civil government; and in that sense, all men are considered free and independent to act, and to have certain valuable rights, which, by way of superlative, are styled “ unalienable;” not that they cannot really be transferred, because when men enter into a state of society, they give upa portion of their rights to secure the remainder, and the aggregate rights and powers of society are only composed of the rights and powers of its individual members, or rather of such of them as are surrendered. The same idea *380 is more clearly expressed in the bill of rights of the State of Connecticut, which says, “all men, when they fofm a social compact, are equal in rights.” It certainly never could have been intended otherwise, either by the framers or the adopters of the instrument, both of whom I consider may be consulted for its meaning, whenever light may be thrown by them on the doubtful or obscure passage. This clause, as originally reported, stood thus: “all men are born equally free and independent,” Journal of Convention, 43 ; the words, “ born equally,” were stricken out and those “ by nature ” inserted; showing that the convention intended, that the clause should be understood, not as if it read, that, at that time, all men were born free or equally free; but merely that by or in a state of nature, they had its freedom and independence; and whilst that state continued, their rights were unalienable. A member of the convention, who conceived a different idea on this subject, while the clause was under consideration, proposed the following amendment, “ on entering into society, men give up none of their rights, they only adopt new modes by yrhich they are better secured.” This however was rejected by ayes 4, nays 39, Journal, 89. A contrary understanding of this passage, from that now maintained, would lead to strange conclusions. All men, that is men of every description, young or old, male or female, whether in a state of nature or society, are not only free, but entirely independent of each other, and all others; consequently the bonds that bind together, not only the master and servant, but the other domestic relations of parent and child, guardian and ward, husband and wife, are all snapped asunder, and each atom of human existence, the moment it is freed, by the impulse of life, becomes independent, and possessed of rights, that cannot be aliened under any circumstance, even for its own preservation; and whatever be his follies or his crimes, neither his life nor his liberty, can be impaired; for society can derive no rights from citizens, who have not the capacity of parting with them. This certainly would be carrying out first principles in a way, that the people of New Jersey never contemplated. They considered (and with them the convention, and, as I believe, the constitution itself agreed) that at the adoption of the constitution, things were to be taken as they then existed, *381 without doing violence to public feeling; and that the very utmost force that could be given to the clause in question, was that of a mere guide to future, and not a restriction to past legislation. Nor do I conceive, that the first article in the schedule aids the construction contended for by the prosecution; but taken altogether it proves pretty conclusively the contrary; for although by it “ the common laws and statute laws, now in force, not repugnant to this constitution, shall remain in force,” and by implication such as are repugnant may be repealed ; yet by the same article, “ all contracts, claims and rights of individuals and bodies corporate, shall continue as if no change had taken place.”
Other states in their bills of rights have adopted similar clauses to that under consideration, without producing any extraordinary effect. Virginia in 1776 declared, “ That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot by any compact, deprive or divest their posterity : namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.” This was re-adopted in convention in 1830 by her distinguished statesmen and jurists. Yet Virginia does not consider, that she abolished slavery, by the adoption of her constitution. Lest 'it might however be supposed, that Virginia is too deeply interested in the subject of slaves to give a just interpretation to language applicable to them, take the constitution of Vermont, a state perhaps more hostile to slavery than any other in the union. It was adopted July 4th, 1793, and the first clause of its declaration of rights, reads as follows, “ That all men are born equally free and independent, and have certain natural inherent and inalienable rights, among which are the enjoying and defending life and liberty, acquiring possessing and protecting property, and pursuing and obtaining happiness and safety ; therefore, no male person, born in this country, or brought from over sea, ought to be holden by law to serve any person as a servant, slave, or apprentice, after he arrives to the age of twenty-one years, nor female in like manner after she arrives at the age of eighteen years, unless they are bound by their own consent, after they arrive at such age, or bound by the law for the payment of debts, *382 damages, fines, costs, or the like.” Even in Vermont, a person may be held “ a servant, slave or apprentice,” if a male till he arrives at twenty-one, and if a female till she arrives at eighteen years of age, although “ not bound by their own consent,” or “ by law.” That is, although all men are born equally free and independent, and possessed of the “inherent and inalienable rights ” of “ enjoying and defending life and liberty,” yet they may be held to involuntary servitude or slavery, up to certain ages. So that in Vermont as well as in Virginia, slavery is not considered incompatible with her bill of rights, although the terms used ai’e stronger than those in our constitution. But the court have been referred to the constitution of Massachusetts, and the decisions of her courts thereon, as maintaining a.contrary doctrine. The constitution of that state was adopted March 2nd, 1780, and the first article of its bill of rights reads thus, “ All men are born free and equal, and have certain natural, essential and unalienable rights,” &c. This phraseology is different from that used in New Jersey; it adopts as a fundamental principle for Massachusetts, that thore can be no slavery there, because all “are born free and equal.” But ours is merely that all men by nature, or in a state of nature are free and independent. What construction might be put upon the other part of the clause, respecting unalienable rights, it is not necessary to consider, because the courts in Massachusetts place their decision, if upon the bill of rights at all, upon the phrase “ all men are born free and equal.” But it is manifest, from these decisions, that this article was a mere reaffirmance of an old principle in Massachusetts, and that it neither adopted any thing new nor abolished any thing old. It could not have abolished slavery, for that never legally existed there. By a colonial ordinance as early as 1641, it was ordained, that there should be no bond slavery, villenage or captivity amongst them, with the exception of captives in war, and persons judicially sentenced to servitude • and although rather by permission, growing out of the corruption of the times than by foi’ce of any law, slavery crept in and was for a time tolerated ; yet, whenever the question was presented for adjudication, the courts still maintained that birth gave freedom. Thus Chief Justice Parsons, in the case cited from 4 Mass. R., 128, says, “ several negroes born in this *383 country of imported slaves, demanded their freedom of their masters by suit at law, and obtained it by judgment of courtand in the case of Lyttleton v. Tuttle, referred to in the same report, and which was tried in 1796, the court unanimously decided that Cato, whose father and mother were slaves, was free, not by virtue of the hill of rights of 1780, but that he was born free seven years before that was adopted. From these cases, we have a right to infer, that the.bill of rights adopted no new principle for'this state ; that slavery did not then legally exist there, and that consequently, it was not thereby abolished, although it may he true as Chief Justice Shaw says, in the Commonwealth v. Ives, 18 Pick. R. 193, “ it being agreed on all hands that if not abolished before, it was by the declaration of rights the adoption of that being referred to as the period, when all agreed that the non-slavery principle was in full force and generally recognized. So in 1836, when the case of the Commonwealth v. Ives came up by which a tempoi’ary sojourner in Massachusetts from Louisiana attempted to hold his slave in the former state, and take her back to the latter, the court simply determined, as had been done years before in Westminster Hall in the celebrated case of Somerset v. Stuart, that slavery being contrary to the laws of nature, and no statute of the state authorizing it, nor of the state or general government requiring that the rights of slaveholders from other states should be recognized or enforced in Massachusetts, except in cases of fugitive slaves, the slave from Louisiana, when in Massachusetts, was free; being, according to the earliest principles of the state, as well as thoss of her constitution, born free ; with both of which decisions I entirely concur, as well in regard to their principles as results. But how different is the state of things in New Jersey, where, unfortunately slavery in some form or other has been recognized and provided for, from the settlement of the country to the present moment. The Lords Proprietors of New Jersey, in order to encourage emigration, not only gave large portions of land to every individual, who would settle in the country, and also a proportionate number of acres for every man-servant and maid-servant that he should bring with him before January the 1st, 1665, but also “ for every weaker servant or slave, male or female exceeding the age *384 of fourteen years arriving there, sixty acres of land.” L. & Spicer 21. And by the laws of the colony of East Jersey, passed in 1682, 1694 and 1695, L. & S. 254, 340 and 356, slavery is recognized ; and by the acts of the colonial legislature of 1713 and 1714, particular provisions are made on the subject; and this act remained in force until it was repealed and provided for by the act of 1798, now in force ; which, not only provides that slaves for life shall continue so unless manumitted according to law, but also authorizes “foreigners, travellers and temporary residents” to bring their slaves with them. This statute was in full force when the constitutional convention was authorized, and when its members were elected and assembled, and when the result of their labors was laid before the people, and adopted ; and yet it is not alleged that during all this time anything was publicly said on the subject of slavery being an evil to be provided for by a new constitution, or being in fact provided for by that instrument. The first reference to the subject that appeared in print, is said to have been a short newspaper paragraph, after the constitution was adopted; when it was suggested that by it all slaves were made free. To give such a construction to the constitution now would be considered a wanton stretch of judicial power and a fraud upon those who framed, as well as on those who adopted that instrument; as establishing a principle which the legislature, though possessing full power to do so, have never even attempted. The constitution, like all similar instruments, was the result of compromise. Every thing which could reasonably give of-fence or create parties, was carefully excluded, and the consequence was, that it was unanimously adopted by the convention, and by the vote of the people, of nearly six to one of those who voted. Had the principles, now contended for, been incorporated in it, or the first article been considered capable of being so construed, the spirit of party would probably have burst forth ; and the effort to frame a new constitution, would either have been ineffectual, or the instrument itself rejected by the convention and the people. Not but that the citizens of New Jersey are as devoted to freedom as those of any other state, but they are differently situated and have unfortunately imbibed from their settlement different principles, which have entailed on them something *385 of the evils of slavery. The “ gradual abolition ” which they have been steadily and preservingly effecting, required no startling novelty that might endanger a revulsion of sentiment on that subject.
Slavery was planted in the State, not by her sons, nor by the fruits of an illicit slave trade, nor, through the poor apology of Las (Jasas, to save the aborigines; but the lords and owners of the country, mostly living abroad, implanted it at the very settlement for their own private emolument. The colonists, without the power of abolishing, regulated the evil until after the revolution; when warmed by its spirit and influenced by the principles of the declaration of independence, in 1804, when there was something to lose by the operation, the legislature abolished slavery in the State; not in every respect and inslantaneously, not at once thrusting out the aged and decrepit and the helpless infant, from their comfortable homes, to become the inmates of a poor house, or the subjects for the settlement laws to adjust; but it was done as most great and good things are done, gradually: — All persons born after July 4th, 1804, though subject to servitude for a few years, were to be born free, and all under forty might be made so. Both restrictions to immediate and general freedom arose from the dictates of humanity. The right of manumission was with the master, not the slave; and both justice and humanity forbade that the slave, after he had spent the vigor of his manhood in his master’s service, should be manumitted, or turned off to die like the brutes, or left to charity for support. So infants, being incapable of self-support, were required to serve an apprenticeship though otherwise free. This was done not to retain a lingering hold on slavery, or for the benefit of the master, but for the public welfare and the particular benefit of the child, as is manifest from the act of 1804, the third section of which authorized the master to abandon the children of his slaves, within one year after their birth, by which they became paupers, to be supported by the townships, and to be bound out by the overseers in the same manner as other poor children, until, if a male, the ago of twenty-five, and if a female, the age of twenty-one. But this section, being used by the masters for their benefit and the injury of the children, it was re *386 pealed the next year, Bloomfield, 106, and thus the masters, though, their rights in slaves were materially depreciated, were, and still are, compelled to support their slaves and their children, not by the mere ordinary poor rates, but to the extent of their whole property, though it should deprive every child of its patrimony. This has been the law since 1804, and under its benign influence slavery in the state has become almost extinct, without leading to poverty or crime, and without the legislature having attempted to make its operation more summary. — ■ Without complaint on this subject a convention is called, who propose to the people a constitution, which is adopted, containing certain general phrases of abstract natural right, no stronger than those in the declaration of independence; yet under the force of these terms, the judiciary are called on to overthrow by their decision, all the laws of the state on the subject of slavery and its apprenticeship, and to exonerate the master from the support of the infirm and helpless — I do not believe that we possess any such power, or that a fair construction of the constitution can give it to us ; jus dioere et non jus daré is the province of the judiciary; and although, in the exercise of a clear power, as invoked in this case, we may, with propriety, say, fiat justitia ruat ccelum yet when that power does not exist, or its existence is doubtful, the application should be made to the legislature and not to the judiciary. The construction which I have given to the constitution, has rendered it unnecessary to inquire into the distinction, if any exist, between the two classes of cases. — Judgment must be rendered against the prosecutors in both cases.
Carpenter, J., concurred in the result of the opinion delivered by Justice Nevius, and in the general tenor of the reasoning on which it is founded.
Hornblower, C. J. dissented from the decision of the court.
Whitehead, J., did not hear the argument and gave no opinion. ^
Aeexrmed, 1 Zab. 699.