225 N.J. Super. 504 (1988)
543 A.2d 56
JOHNNIE FRANKLIN, ET AL., APPELLANTS,
v.
NEW JERSEY DEPARTMENT OF HUMAN SERVICES, RESPONDENT.
JANET MCCURDY, ET AL., APPELLANTS,
v.
NEW JERSEY DEPARTMENT OF HUMAN SERVICES, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1988.
Decided May 31, 1988.
*506 Before Judges PRESSLER, BILDER and SKILLMAN.
Nancy Goldhill argued the cause for appellants Johnnie Franklin, et al. (Legal Services of New Jersey, Angelica Anaya-Allen and Peggy Earisman, Passaic County Legal Aid Society, Olga Bradford, Camden Regional Legal Services, Ken Goldman, Cape-Atlantic Legal Services, Theodore Gardner, Hudson County Legal Services, Connie Pascale, Ocean-Monmouth Legal Services, Joyce Helfman, Middlesex County Legal Services, and Richard Foard, III, Essex-Newark Legal *507 Services, attorneys; J. Harris David, Melville D. Miller, Jr. and Nancy Goldhill, on the brief).
David G. Sciarra, Assistant Deputy Public Advocate, argued the cause for appellants Janet McCurdy, et al. (Alfred A. Slocum, Public Advocate, attorney; Richard E. Shapiro, Director, Division of Public Interest Advocacy, and David G. Sciarra, of counsel and on the brief).
Deborah T. Poritz, Assistant Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel and Dennis J. Conklin, Deputy Attorney General, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
These appeals challenge the validity of N.J.A.C. 10:82-5.10(d)(1)(vii), which places a five month limit on the period a recipient of Aid to Families with Dependent Children (AFDC) can receive emergency shelter assistance. One appeal was filed by the Public Advocate on behalf of himself and twelve recipients of AFDC, who alleged that the impending termination of their emergency shelter assistance would place them in imminent danger of homelessness. The second appeal was filed by the State Office of Legal Services and seven county Legal Services offices on behalf of fourteen AFDC recipients, who also alleged the termination of their emergency shelter assistance under the challenged regulation would render them homeless.
Appellants filed motions for a stay pending appeal of the five month limitation on emergency shelter assistance, which this court denied by a two-to-one vote. Appellants then filed motions for a stay pending appeal with the Supreme Court. The Supreme Court granted the motions on May 3, 1988, with three members of the court dissenting. The Court's orders stayed the termination of emergency shelter assistance for 30 days *508 and directed this court to decide the merits of the appeals prior to the expiration of the 30 day period.
Because the appeals challenge the same administrative regulation, we hereby consolidate them on our own motion.[1]
The emergency assistance benefits program involved in this appeal supplements the federal AFDC program authorized by Title IVA of the Social Security Act, 42 U.S.C. § 601 et seq. The AFDC program was enacted
For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection.... [42 U.S.C. § 601; emphasis added].
Under the AFDC program "each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." King v. Smith, 392 U.S. 309, 318-319, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1118 (1968). Consequently, the "States have traditionally been at liberty to pay as little or as much as they choose, and there are, in fact, striking differences in the degree of aid provided among the States." Rosado v. Wyman, 397 U.S. 397, 408, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970).
The payment of emergency assistance (EA) is authorized by 42 U.S.C. § 606(e). A state which participates in the AFDC program is not required to provide EA benefits, and if a state *509 elects to provide EA, it is not required to pay any specified level of benefits. See Blum v. Bacon, 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982); Quern v. Mandley, 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658 (1978).
There is no specific statutory authorization for the State of New Jersey to participate in the EA program. However, the Department of Human Services has properly construed N.J.S.A. 44:10-1 et seq. as an implied authorization for the State's participation in this program. Cf. Maticka v. City of Atlantic City, 216 N.J. Super. 434, 446 (App.Div. 1987). Such authorization has been confirmed by the inclusion of a separate line item appropriation for EA in the Annual Appropriations Act enacted by the Legislature. L. 1987, c. 154 (5 N.J. Sess. Law Serv. (1987) at 280 (West)).
The present version of the State's EA regulations was adopted on November 16, 1987, following a comprehensive review of those regulations after the decision in Maticka v. City of Atlantic City, supra. In that case, the Public Advocate challenged a 90 day limitation on emergency shelter assistance contained in the prior version of N.J.A.C. 10:82-5.10(c) and also a requirement imposed by administrative directive that a need for emergency shelter must be "sudden and unexpected," rather than a situation for which the recipient had an "opportunity to plan." The court held that the Department's administrative interpretation of its regulations was invalid, insofar as it disqualified recipients who were aware of impending homelessness but were unable to avert the emergency before it occurred. 216 N.J. Super. at 451-453. The court further concluded that it could not definitively assess the validity of 90-day limitation on the receipt of emergency shelter assistance by AFDC recipients
until the Department itself, by way of a comprehensive public hearing, has had the opportunity to reassess that limitation in terms of the scope and nature of the homelessness problem, the existence of all other resources for homeless families and the manner in which and by whom these resources are coordinated and actually made available, the financial impact of extending emergency assistance beyond 90 days, and a consideration of whether or not there are any *510 other appropriate and reasonable conditions or limitations which could or should be imposed in determining eligibility or continued eligibility for assistance. [216 N.J. Super. at 455].
Therefore, it remanded the matter to the Department of Human Services "for a rule-making hearing both on the effect and consequence of the 90-day limit of N.J.A.C. 10:82-5.10(c)." Id. at 456; see also Rodgers v. Gibson, 218 N.J. Super. 452 (App. Div. 1987), which reached essentially the same conclusions as Maticka with respect to the regulations governing the program of emergency shelter assistance for General Assistance recipients.
In accordance with this remand, the Department of Human Services conducted "fact finding" hearings at three locations on March 19, 1987. After those hearings, the Department proposed new regulations to substantially expand the EA program, which included an authorization for two one-month extensions of the initial 90 day limitation on the receipt of emergency shelter assistance. The Department estimated that this expansion of the EA program would cost an additional $8.7 million annually, of which $2 million would come from new State appropriations, 19 N.J.R. 1174. The Department held hearings with respect to the proposed new regulations at three different locations on July 23, 1987. Thereafter, the Department made certain changes in the proposed regulations, which were adopted in final form effective November 16, 1987. N.J.A.C. 10:82-5.10.
Under the amended regulations, there are now three kinds of emergencies in which EA is available: (1) a fire, flood or other similar disaster which results in the homelessness of an eligible family; (2) a pending or actual eviction, a mortgage foreclosure, or other circumstances resulting in the loss of a permanent shelter, provided the recipient family demonstrates a lack of realistic capacity to plan for substitute housing; or (3) an imminent placement of children in foster care due to the family being subjected to a serious health or life threatening situation because of the lack of adequate shelter. N.J.A.C. 10:82-5.10(c).
*511 Emergency assistance may consist of special allowances for food, clothing, housing, furnishings and child care. N.J.A.C. 10:82-5.10(d)(2)(3)(4) and (5). However, the most significant kind of EA is shelter. Under the new regulations, emergency shelter assistance now may take the form of payment of as much as three months retroactive rental, mortgage or utility costs, in order to prevent eviction or foreclosure. N.J.A.C. 10:82-5.10(c)(2)(i). Other forms of emergency shelter assistance include grants to pay expenses for establishing a new home, such as security deposits for rent and utilities, advance rent, N.J.A.C. 10:82-5.10(d)(1)(iii), and moving expenses, N.J.A.C. 10:82-5.10(d)(1)(iv). Where an emergency causes a recipient to become homeless, emergency shelter assistance involves placement in an emergency shelter, N.J.A.C. 10:82-5.10(d)(1), generally a hotel or motel. Such assistance may be provided for up to three months, N.J.A.C. 10:82-5.10(d)(1), during which time the recipient, with the aid of the county welfare agency, has a continuing responsibility to seek permanent shelter. N.J.A.C. 10:82-5.10(d)(1)(v); N.J.A.C. 10:82-5.10(d)(6). If permanent living arrangements cannot be obtained during the three month period, emergency shelter assistance may be continued for an additional two months. N.J.A.C. 10:82-5.10(d)(1)(vii).[2] Thus, the maximum period during which emergency shelter assistance may be provided is five months.[3]
Appellants do not challenge the eligibility criteria for EA or the form in which such assistance is provided. Appellants challenge only the five month limitation on such assistance.
*512 These challenges are based entirely on State law. Appellants do not contend that the five month limit on emergency shelter assistance violates 42 U.S.C. § 606(e) or any other federal statute or regulation.[4] Nor do appellants contend that this limitation violates any provision of the United States Constitution. In not relying on federal constitutional grounds, appellants were undoubtedly mindful of statements by the Supreme Court of the United States that "the intractable economic, social, and even philosophical problems presented by public assistance programs are not the business of this Court" and that "the Constitution does not empower this Court to second guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriads of potential recipients." Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1970); see also Jefferson v. Hackney, 406 U.S. 535, 545-551, 92 S.Ct. 1724, 1730-1734, 32 L.Ed.2d 285 (1972); Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972).
Appellants challenge the validity of the five month limitation of emergency shelter assistance on three alternative grounds. First, appellants contend that the statute governing the AFDC program, N.J.S.A. 44:10-1 et seq., mandates the provision of shelter to every recipient, and that the termination of emergency shelter assistance violates this mandate. Second, appellants contend that the five month limitation on emergency shelter assistance is arbitrary and capricious because it conflicts with the legislative policy of preventing homelessness. Finally, appellants contend that the time limitation on emergency shelter assistance violates Article I, paragraphs 1 and 2, of the New *513 Jersey Constitution. We reject each of these contentions and therefore affirm the validity of the Department's regulations which impose a five month limitation on emergency shelter assistance.

I
Appellants' statutory argument rests upon N.J.S.A. 44:10-1(a), which is a subsection of the definitions section of the statute authorizing New Jersey's participation in the AFDC program. This section provides:
(a) "Aid to families with dependent children" means the assistance and other services to be extended under this act to or for eligible dependent children and the parents and relatives with whom they are living, for the following purposes:
(1) To provide for the care of eligible dependent children in their own homes or in the homes of relatives, under standards and conditions compatible with decency and health,
(2) To help maintain and strengthen family life,
(3) To help such parents or relatives to attain the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, and
(4) To provide for the care of a dependent child whose parents have been denied assistance under the provisions of section 2.
N.J.S.A. 44:10-1(a) does not by itself impose any obligation upon the Department of Human Services; it only defines "aid to families with dependent children." The State's obligation to participate in the AFDC program is imposed by N.J.S.A. 44:10-3. This section provides:
The Commissioner of Human Services is authorized, directed and empowered to issue, or to cause to be issued by the appropriate departmental officers or agencies, all necessary rules and regulations and administrative orders, and to do or cause to be done all other acts and things necessary to secure for the State of New Jersey the maximum Federal financial participation that is available with respect to a program of aid to families with dependent children and otherwise to accomplish the purposes of this act...
N.J.S.A. 44:10-3 then enumerates eleven purposes of the Act in lettered subparagraphs. Our Supreme Court described the more significant of those purposes as follows:
that welfare programs be in effect in all counties; that assistance be furnished with reasonable promptitude; that all resources and income be considered in determining need except that, as discussed earlier in this opinion, there shall be *514 disregarded the amounts required by federal law as a condition of federal participation; that appropriate services be made available for strengthening family life for children; and that appropriate services and cooperative arrangements be provided with other agencies so that maximum opportunities for training and employment be available to welfare recipients. [Motyka v. McCorkle, 58 N.J. 165, 178 (1971)].
Although N.J.S.A. 44:10-3 does not restate the statutory goals set forth in N.J.S.A. 44:10-1(a), we have no doubt that the Act should be administered in a manner designed to achieve both sets of statutory goals.
However, this does not mean that an administrative regulation or other administrative action which falls short of full realization of these goals is invalid. The administration of the AFDC program, like other governmental programs, is subject to the limitations imposed by the level of annual legislative appropriations for the program.[5] If the appropriations for the AFDC program are insufficient to satisfy all the vital needs of recipients, the Department still must adopt a structure of benefits which can be provided within those appropriations.
Our courts have frequently acknowledged these limitations upon the full realization of the goals set forth in N.J.S.A. 44:10-1 et seq. In Bailey v. Engelman, 56 N.J. 54 (1970), the Court rejected a claim that the State is required to make an individualized determination of the budget needs of each recipient in administering the AFDC program. The Court stated that "[a]ppellant correctly concedes the State is not required to meet the total needs of a recipient of aid." 56 N.J. at 57. In Motyka v. McCorkle, supra, the Court rejected an argument that the State was required under N.J.S.A. 44:10-1 et seq. to provide the same level of benefits in the wholly state funded program of *515 assistance for two parent families with insufficient income as in the AFDC program for single parent families with dependent children. The Court rejected arguments that N.J.S.A. 44:10-1 imposes specific mandates with respect to the State's assistance programs, and it emphasized that state administrative officials must set benefits levels within the limits imposed by legislative appropriations:
[T]he legislative approach was to restrict the imposition of specific mandates to those considered by it to be absolutely essential, and to entrust the administrative agency with comprehensive powers designed to enable it to operate equitably and reasonably under general standards and within the legislative appropriation.
In N.J.S.A. 44:10-1 et seq. the Legislature set forth general goals which the Division [of Public Welfare] has conscientiously sought to achieve within the limits of available finances. [58 N.J. at 176-177].
In Matter of Petitions for Rulemaking, 223 N.J. Super. 453 (App.Div. 1988), the court held that the State must establish a "standard of need" based on actual living costs in New Jersey. However, the court also recognized that the actual "level of benefits" paid to recipients is determined by the level of legislative appropriations:
The extent to which funds are to be made available to meet the standard of need under New Jersey statutes is a political question to be decided by the representatives of the people. [223 N.J. Super. at 460].
Cf. Texter v. Dep't of Human Services, 88 N.J. 376, 386 (1982). Therefore, we reject appellants' argument that the goals of the AFDC program identified in the statutory definition of "aid to families with dependent children" constitutes a legislative mandate to provide any specific level or form of benefits, including open-ended emergency shelter assistance designed to prevent homelessness.[6]
*516 Moreover, even where the Legislature has mandated a particular program, it is subject, insofar as it requires appropriations, to the Annual Appropriations Act. Karcher v. Kean, 97 N.J. 483 (1984); City of Camden v. Byrne, 82 N.J. 133 (1980). "The Constitution has placed the State's conscience in these matters in the Legislature and it is that branch of government which must weigh the interests of its citizens at all levels of government." City of Camden v. Byrne, supra, 82 N.J. at 158. Therefore, even if appellants were correct in reading N.J.S.A. 44:10-1(a) to create a "substantive right" to adequate shelter, that right would still be subject to the availability of sufficient appropriations.
Although appellants concede that this court cannot force the Legislature to appropriate additional funds, they suggest that the court can require the Department to seek supplemental appropriations from the Legislature or to transfer funds appropriated for other programs in order to provide an emergency shelter assistance program of unlimited duration. However, since N.J.S.A. 44:10-1(a) does not require any particular form of AFDC or EA program or any particular level of benefits, the Department has no statutory obligation to seek additional appropriations for these programs.
Beyond that, the courts lack the power to require the executive branch of government to seek appropriations. As stated by the Court in City of Camden v. Byrne:
Some plaintiffs also maintain that despite the responsibility of the legislative branch to enact appropriations and the inability of the courts to compel such *517 legislative action, the courts stand in a different posture vis-a-vis the Governor with respect to his constitutional and statutory responsibilities over State expenditures. The Governor is statutorily authorized to "examine and consider all requests for appropriations" and to "formulate ... budget recommendations" to be forwarded to the Legislature for its consideration and ultimate approval. N.J.S.A. 52:27B-20. Although the power to expend and actually appropriate monies from the State treasury is reserved exclusively to the Legislature, see N.J. Const. (1947), Art. VIII, § II, par. 2, the Governor does have a constitutional role. He may formally object to any item or items included in an appropriation bill by exercising his line-item veto, thereby excising that item or items from the bill. .. . The Governor's statutory authority to propose the State budget and his constitutional power to exercise a selective veto over legislative appropriations reflects his significant responsibilities over the State's fiscal affairs and are an important aspect of the centralization of state finances essential to efficient modern government operations.... Since these executive responsibilities are so clearly involved in the budget process, and since the ultimate constitutional responsibility for appropriations rests with the Legislature, the judiciary is without authority to compel either the Legislature to make a specific appropriation or the Governor to recommend or approve one. [82 N.J. at 149-150].
While the Camden case involved the Governor's role in the appropriations process, we see no constitutional or statutory distinction between the Governor's role and that of the members of his cabinet. Indeed, a cabinet officer's role in the budget process is completely subordinate to that of the Governor. Department heads only make requests for appropriations, which the Office of Budget Management reviews and transmits to the Governor with its findings, comments and recommendations. See N.J.S.A. 52:27B-14, 16 and 19. It is the Governor who then formulates a single proposed state budget which is submitted to the Legislature. See N.J.S.A. 52:27B-20; N.J.S.A. 52:9H-1. Moreover, any proposed transfer of appropriated funds by a cabinet officer is subject to statutory control by other executive and legislative officials. Thus, any transfer in excess of $200,000 must be approved by both the Director of the Division of Budget and Accounting and the Legislative Budget and Finance Officer. L. 1987, c. 154 (5 N.J. Sess. Law Serv. (1987) at 396-397 (West)). Therefore, the judiciary cannot order a department head to make a request for an appropriation or to transfer funds anymore than it can order the Governor to *518 include a recommendation for an appropriation in his proposed budget.
Accordingly, we reject appellants' argument that N.J.S.A. 44:10-1(a) obligates the Department of Human Services to grant emergency shelter assistance of unlimited duration, regardless of the level of EA appropriations and regardless of the other needs of recipients which must be met out of these appropriations.

II
An administrative regulation which does not directly contradict the enabling legislation pursuant to which it was adopted still may be found "arbitrary and capricious" and therefore invalid. Texter v. Dept. of Human Services, 88 N.J. 376, 389 (1982); Pascucci v. Vagott, 71 N.J. 40, 50 (1976). When an administrative regulation is challenged on these grounds, a reviewing court is required to defer to the expertise of the agency entrusted by the Legislature with responsibility for the program and to accord the agency's judgment a presumption of validity. Bergen Pines Hosp. v. Dept. of Human Services, 96 N.J. 456, 477-479 (1984); Texter v. Dept. of Human Services, supra, 88 N.J. at 389; Motyka v. McCorkle, supra, 58 N.J. at 181.
Appellants argue that the five month limitation on the payment of emergency shelter assistance is arbitrary and capricious because it will result in the homelessness of some recipients,[7] contrary to the state's policy to avoid homelessness *519 expressed in N.J.S.A. 44:10-1(a) and various other legislative enactments. See Maticka v. City of Atlantic City, supra, 216 N.J. Super. at 448-449, which catalogues that legislation. More specifically, appellants argue that because the inadequacy of the basic AFDC grant and the shortage of affordable housing make it very difficult for an AFDC recipient to obtain permanent shelter, it is arbitrary and capricious to place a five month limit on the period emergency shelter assistance will be paid. As stated by the Public Advocate, "[a]ppellants pinpoint the ever-widening gap between AFDC benefit levels and rising housing costs as the primary impediment to obtaining permanent shelter."[8]
When the Department of Human Services proposed the new EA regulations, it gave the following reasons for the five month limit on the receipt of emergency shelter assistance:
The Department had seriously considered the unrestricted extension of the 90 day limit for emergency shelter (that is, maximum of two calendar months following the month in which the state of homelessness becomes known to the CWA). However, monthly and annual fiscal reports submitted by CWAs of emergency assistance cases, recipients and disbursements disclosed that 95 percent of emergency situations lasted less than 90 days. Significantly, more than half of the emergencies (52.1%) were resolved within one week, with two-thirds resolved in three weeks, and nearly three-fourths of all emergencies addressed within a month. At all times during the emergent situation, a family continues to receive its monthly public assistance grant. To expand the EA *520 program further could result in a separate permanent public assistance program for housing and shelter, which would merely compensate for the inadequacies of current programs which are specifically charged by Congress and the legislatures with providing housing assistance for low-income families. Neighboring states' recent experience with unlimited EA for housing resulted in an enormous cost to the public with no permanent solutions to homelessness. [19 N.J.R. 1173].
In a March 10, 1988 report to the Legislature, the Commissioner of Human Services expanded upon his Department's reasons for not adopting regulations which would authorize emergency shelter assistance for an indefinite period of time:
A shortage of affordable housing has created a crisis for many New Jerseyans. This housing shortage, fueled by skyrocketing housing costs, gentrification, and increased commercial and residential development in urban centers, has made it increasingly difficult for low-income families to remain adequately housed.... It is this structural problem of too little affordable housing that gives rise to most homelessness and that creates the need for emergency assistance in the state's AFDC program.
Any attempt to alleviate homelessness short of systemic efforts to expand the supply of affordable housing  an expensive and difficult effort at best  will fall short. In the absence of an increased housing supply, our programs, including emergency assistance, must be marginal solutions that mitigate, but do not eliminate, the problems of homelessness. To expect more from the tools at hand, including emergency assistance, is unrealistic and to attempt to turn these limited tools into broad solutions is impossible.
It is only in this context that the state's emergency assistance program can be understood. The emergency assistance program is intended to provide emergency, time-limited assistance to individuals on AFDC. Available services under emergency assistance include emergency shelter, food, up to three months back rental assistance, security deposits, replacement of lost clothing or furniture, and health and social service supports. But despite this broad scope of benefits, the AFDC law does not contemplate that emergency assistance be an ongoing housing subsidy program.
* * * * * * * *
[D]ramatic action has already been taken by the Department on emergency assistance. But removing the time limit  the last available liberalization in emergency assistance  presents enormous problems.
First, an open-ended emergency assistance program duplicates the AFDC program. Providing both together amounts to a selective and dramatic AFDC grant level increase for a subset of the population  those who receive emergency assistance.
Second, emergency assistance is the wrong way to attempt to keep families permanently and adequately housed. Federal matching funds are not available for open-ended emergency assistance. Indeed, the Department of Health and *521 Human Services attempted in 1987 to limit emergency assistance to 30 days; this attempt was temporarily stopped only by Congressional intervention.
Third, open-ended emergency assistance fails to address the root cause of homelessness  an inadequate and shrinking supply of affordable housing. Emergency assistance is not a long range answer to homelessness; reliance on it only diverts attention and funds from the real need.
Fourth, eliminating the time limit on emergency assistance would create an enormous unfunded liability in the AFDC program. The current limited policy is already causing a severe deficit in emergency assistance. We are, therefore, already beyond our fiscal limits in the emergency assistance program, even without an open-ended policy.
Fifth, limited emergency assistance funds must be used for "emergencies." Ongoing housing support, a use not anticipated in Federal policy, state regulation, or, most importantly, budget appropriations, will make the Department unable to use these limited funds for time-limited needs....
Sixth, we must ask what would be supported by an unlimited emergency assistance program. Such an approach would make residence in hotels or motels a permanent fact of life for some New Jersey welfare recipients and their children....
Finally, we must consider the cost of an unlimited emergency assistance program. We have seen that the changes already made in emergency assistance have added $15 million to the cost of the program. Removing the time limit would add at least $20 million  all unbudgeted  to this total. And again, these funds would support only the worst living arrangements in hotels and motels, at an average monthly cost of $1,200-$2,000.
* * * * * * * *
... Trying to contort a program  emergency assistance  that was designed for an entirely different purpose into a solution to the low-income housing problem is a losing proposition. All of America is struggling with the tragedy of homelessness; we cannot address it through a limited, inappropriate welfare program.
We find nothing arbitrary and capricious in the Department's reasons for limiting the duration of emergency shelter assistance. The Department's EA regulations reflect an awareness of the need for a governmental response to imminent homelessness. The regulations also reflect an awareness that the shortage of affordable housing is one of the root causes of the homelessness problem, but that only limited government funds are available to address the problem. Therefore, those funds must be wisely spent. While emergency shelter assistance provides a temporary response to an imminent need for *522 housing, it is both enormously expensive for the government[9] and a highly unsatisfactory form of shelter for recipients. Therefore, we conclude that the Commissioner's decision to limit the duration of emergency shelter assistance rationally serves the goal of equitably apportioning the limited funds appropriated for welfare among AFDC recipients.

III
Appellants' constitutional attack upon the five month limitation on emergency shelter assistance is based entirely on Article I, paragraphs 1 and 2, of the New Jersey Constitution, which provide:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness. [N.J. Const. (1947), Art. I, par. 1].
All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people, and they have the right at all times to alter or reform the same, whenever the public good may require it. [N.J. Const. (1947), Art. I, par. 2].
Appellants' theory is that these provisions impose an affirmative obligation upon state government to provide certain necessities of life for indigent persons, including shelter. However, this theory is not supported by the history of these constitutional provisions, their language, or the prior decisions of the Supreme Court of New Jersey.
*523 Article I, paragraphs 1 and 2, were adopted in substantially their present form in the 1844 New Jersey Constitution.[10] These constitutional provisions set forth principles of government substantially similar to those expressed in the Declaration of Independence and the Virginia Declaration of Rights.[11] *524 Comparable provisions are contained in the constitutions of most other states. C.W. Heckel, "The Bill of Rights" (Monograph), II Proceedings of the New Jersey Constitutional Convention of 1947, 1336, 1338-1340. These provisions, as well as other paragraphs of the Bill of Rights, were intended to establish "a limitation upon the capacity of the sovereign" and to make clear that "the people are the master, and the sovereign the servant." Id. at 1336.
These principles of democratic government, rooted in eighteenth century political philosophy, are fundamentally different from any concept of a governmental obligation to provide social services. A prohibition against the government interfering with a citizen's "acquiring, possessing, and protecting property," secured by Article I, paragraph 1, of the New Jersey Constitution, does not imply any governmental obligation to provide shelter or other necessities at public expense. Likewise, Article I, paragraph 2, articulates the basic democratic principle that the purpose of government is to serve the people and that the people therefore have the right to change the form of government, but this provision does not impose an affirmative obligation on government to furnish the necessities of life to its citizens.
The decisions of the Supreme Court of New Jersey have consistently held that Article I, paragraph 1 secures individual liberties against governmental infringement but does not mandate government financing of social services. Thus, in Right to *525 Choose v. Byrne, 91 N.J. 287 (1982), the Court held that a statute which prohibited Medicaid funding for most abortions violated Article I, paragraph 1. However, the rationale for this holding was that Article I, paragraph 1 implicitly guarantees equal protection of the laws, and that the exclusion of medically necessary abortions from a system providing all other medically necessary care for indigents violated this guarantee. 91 N.J. at 310. The Court specifically stated: "[T]he right of the individual [under Article I, paragraph 1] is freedom from undue government interference, not an assurance of government funding." 91 N.J. at 307, n. 5. Therefore, Right to Choose recognizes that the State has no constitutional obligation to finance medical care for the needy, but if it chooses to provide such care, it may not invidiously discriminate with respect to the services it provides. Similarly, in Barone v. Dept. of Human Services, 107 N.J. 355 (1987), the Court rejected a claim that Article I, paragraph 1 was violated by a provision of the Pharmaceutical Assistance to the Aged and Disabled Act, N.J.S.A. 30:4D-20 to 35, which granted benefits to disabled persons under 65 who received social security payments but denied benefits to disabled persons under 65 who did not receive social security. The Court noted that its opinion in Right to Choose had not rested on a "constitutional right to health." 107 N.J. at 369. The Court went on to say:
State funds available for public assistance programs are limited. It is the Legislature that has the duty to allocate the resources of the State. As long as the classification chosen by the Legislature rationally advances a legitimate governmental objective, it need not be the wisest, the fairest, or the one we would choose. It is not for the courts to determine if there is a better way to allocate resources under these programs. [107 N.J. at 370].
The cases interpreting Article I, paragraph 1 relied upon by appellants involved traditional challenges on equal protection or due process grounds to legislative enactments which allegedly infringed upon individual rights.[12]See, e.g., Right to Choose v. *526 Byrne, supra; State v. Baker, 81 N.J. 99 (1979) (municipal ordinance which prohibited more than four unrelated individuals from sharing a single housing unit held to deny due process); Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6 (1976), cert. den. 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977) (zoning ordinance which limited use of mobile homes to families in which the head of household or spouse was 52 years of age or older held not to deny equal protection); cf. In re Grady, 85 N.J. 235, 249-250 (1981) (Article I, paragraph 1 encompasses the right of a mentally retarded person to be sterilized). However, none of these cases interpreted Article I, paragraph 1 to impose an affirmative obligation upon the government to finance social services.
Similarly, in Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 67 N.J. 151, 174-175 (1975) (Mount Laurel I) and Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158, 208-209 (1983) (Mount Laurel II), the Court held that a municipality which uses its zoning power to exclude housing for lower income persons violates the due process and equal protection guarantees of Article I, paragraph 1. See also Hills Development Co. v. Bernard Tp., 103 N.J. 1, 40 (1986). However, the Court did not hold that either the State or municipalities have any constitutional obligation to construct housing for lower income persons.
We also note that paragraphs 1 and 2 of Article I, which protect persons from improper exercises of government power, are fundamentally different from the Education Clause of the New Jersey Constitution, which imposes an affirmative obligation upon the Legislature to "provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in this State between the age of five and eighteen years." N.J. Const. (1947), Art. VIII, § 4, par. 1. See Robinson v. Cahill, 69 N.J. 449 (1976); Robinson v. Cahill, 62 N.J. 473, 501-521 (1973). *527 There is no constitutional provision comparable to the Education Clause which obligates the State to provide free shelter for citizens who are unable to afford it.[13]
*528 The Public Advocate also argues that the five month limitation on emergency shelter assistance "violates the equal protection concepts enshrined in Article I, par. 1." The Advocate claims that this limitation discriminates against AFDC recipients who are unable to secure permanent shelter within five months. However, such a classification will not be invalidated unless it is shown not to rationally advance a legitimate governmental objective. Barone v. Dept. of Human Services, supra, 107 N.J. at 370. We are satisfied for the reasons expressed at length in section II of this opinion that the five month limitation on emergency shelter assistance is rationally related to the legitimate governmental objective of equitably apportioning the limited funds appropriated for welfare among AFDC recipients.
Finally, we note our whole-hearted agreement with the view of our dissenting colleague, expressed in Maticka v. City of Atlantic City, supra, 216 N.J. Super. at 447, that "a civilized society cannot tolerate the homelessness of those of its members who are too impoverished to provide shelter for themselves." See also DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 436 (1970) (noting that the critical housing situation addressed in that case "cries out for the active and continuous exercise of the highest responsible citizenship by all segments of the population and all governmental bodies.") However, the common consensus that government is obligated to address the problems of homelessness does not mean that this obligation is enshrined in the Constitution. Government has many obligations, such as the care of the mentally ill and retarded, the protection of its citizens from criminals, and the maintenance of a basic transportation system, which may be properly characterized as fundamental. But the manner in which government discharges these obligations, and the amount of money it is prepared to allocate to any particular area of its responsibilities, are subjects within the province of the executive and legislative branches, rather than the judiciary. We add that the executive and legislative branches *529 of state government have addressed the problem of homelessness by proposing and enacting new legislative programs, such as the Prevention of Homelessness Act of 1984, N.J.S.A. 52:27D-280, et seq. and the Emergency Shelters for the Homeless Act of 1985, N.J.S.A. 55:13C-1 et seq., and by increasing appropriations for existing housing programs. These new initiatives have not yet solved the problem of homelessness, but we refuse to presume that these legislative enactments and the efforts of the Commissioner of Human Services will fall short of their goals. In any event, the difficulties experienced by the responsible government agencies in dealing with homelessness do not elevate the problem to constitutional dimensions, or justify judicial intervention.
Consequently, we affirm the validity of the part of the Department of Human Services' EA regulations which impose a five month limit on the receipt of emergency shelter assistance.
BILDER, J.A.D., concurring.
Essentially we are being asked to review delicate (and difficult) fiscal and policy choices made by the political branches of government. As a humanist, I subscribe to the philosophy Judge Pressler has expressed in her dissent; as a jurist, I must totally agree with the legal views expressed by Judge Skillman. The people have wisely left such choices to the political branches of government. It is not the judicial role to convert political goals into legal imperatives.
Our Supreme Court has recognized that
State funds available for public assistance are limited. It is the Legislature that has the duty to allocate the resources of the State. [Barone v. Department of Human Services, 107 N.J. 355, 370 (1987)]
In considering classifications for categorical aid to those in need of pharmaceutical assistance, the court said:
As long as the classification chosen by the Legislature rationally advances a legitimate governmental objective, it need not be the wisest, the fairest, or the one we would choose. It is not for the courts to determine if there is a better way to allocate resources under these programs. [Id. at 373]
*530 The methods by which the problem of homelessness is to be met are choices for the legislative and the executive branches. They are entitled to consider fiscal and administrative constraints in defining eligibility for social welfare. Ibid.; Texter v. Human Services Dep't, 88 N.J. 376, 389 (1982). In considering challenges to their choices, we must be careful not to substitute our judgment for theirs. Ibid. It is not for us to consider whether it is the wisest or fairest plan or, a fortiori, the one we would choose. See Barone v. Department of Human Services, supra 107 N.J. at 370; see also Maticka v. City of Atlantic City, 216 N.J. Super. 434, 457 (App.Div. 1986) (concurring opinion). This is particularly true where choices are being made between unacceptable alternatives  choices between bad and worse.
In order for us to get involved in a review of fiscal or policy choices, there must be a clear showing of a deprivation (or threatened deprivation) of a constitutional or statutory right or of arbitrary (i.e., unreasonable or irrational) conduct in failing to carry out a statutory mandate; and an unwillingness or inability on the part of the coordinate branches to properly carry out their responsibilities such as forces us reluctantly to intervene. Our function is not to supersede government  to be a supergovernmental authority  but to vindicate individual rights when the other branches of government have abdicated their responsibilities  and to do so in that manner which least interferes with the proper functioning of government and with the traditional rights of our citizens to self-government.
This limitation on the exercise of our power arises not only from the constitutional division of governmental functions, see N.J. Const., Art. III, par. 1, and time-honored traditions of restraint, see Mountain, Judicial Activism, 10 Seton Hall L. Rev. 6, 7-8 (1979), but from a practical understanding of our own limitations and the need to retain our own credibility, id. at 13-14. See also Gilbert v. Gladden, 87 N.J. 275, 282 (1981).
*531 PRESSLER, P.J.A.D., dissenting.
I respectfully dissent from the decision of my colleagues which, as I understand it, concludes that there is no judicial recourse from an administrative regulation which leaves impoverished and homeless AFDC families without any shelter at all if they have been unable to find permanent or other alternate housing during the five months of their receipt of emergency assistance.
My fundamental disagreement with the majority lies in our differing interpretation of controlling statute. In large measure my views have already been expressed in Maticka v. City of Atlantic City, 216 N.J. Super. 434 (App.Div. 1987). I continue to adhere to the proposition that N.J.S.A. 44:10-1, et seq., must be read in the light of the public policy of this state as expressed in the gubernatorial, legislative, and judicial statements and actions referred to in Maticka. I believe that construed in that context, N.J.S.A. 44:10-1, et seq., does more than prescribe laudable goals and purposes whose implementation is intended to be left entirely to administrative discretion. I believe rather that that statute requires that AFDC recipient families who have become homeless be afforded temporary shelter until they are able to obtain some form of reasonable alternate housing.
In brief, N.J.S.A. 44:10-3 directs the Commissioner of Human Services to issue regulations and "to do or cause to be done all other acts and things necessary * * * to accomplish the purposes of this act * * *." The paramount purpose of the act is to keep dependent children with their families in a home. N.J.S.A. 44:10-1(a)(1). None of the purposes of the act are achievable for a family with dependent children which not only lacks a home in the conventional sense but which lacks any shelter at all. Nor, for that matter, is life itself ultimately sustainable without any shelter at all. The completion of the syllogism is therefore, in my view, self-evident. An administrative regulation burdened by a qualification which remits assisted *532 families to unrelieved homelessness fails to accomplish the purposes of the Act. It consequently cannot be sustained.
We said in Maticka, and it still seems to be true, that under the present statutory and regulatory framework, emergency assistance pursuant to N.J.A.C. 10:82-5.10(d)(1)(vii) remains the last recourse for homeless AFDC families. Hence, the validity of any regulatory limitation on the availability of emergency assistance must be measured by the single standard of whether that limitation will leave homeless families unsheltered. We so held in Maticka, and it was for this reason that we there struck down the so-called fault standard of the former regulation  a judicial action which has, according to this record, tripled the number of AFDC families eligible for emergency assistance, raising the annual number of eligible families from 5,000 to 16,000. The same reasoning applies to a time limitation. We did not, however, strike down the then three month time limitation in Maticka since, as we there pointed out, we could not assess the validity of that limitation because the record then before us was inadequate to establish whether that time period afforded a sufficient opportunity for obtaining replacement housing or whether there were other shelter resources available to these homeless AFDC families once their emergency assistance benefits were exhausted. We therefore directed the public hearings and reconsideration of the emergency assistance regulation which have since ensued.
The revised regulation effectively extends the time limitation from three months to five months. The first five-month period under the revised regulation expired on March 31, 1988. Had there been neither executive, legislative, administrative, nor ultimately judicial intervention, 940 homeless AFDC families then being sheltered under the emergency assistance program would have found themselves out on the streets. That fact alone, in my view, demonstrates the incompatibility of the time-limited regulation with the mandate of the statute, and that incompatibility, in turn, requires the invalidation of the time limit. It is well established that if an administrative *533 regulation is inconsistent with the purpose, policy, or mandate of the enabling statute, the reviewing court is obliged to strike it down. See, e.g., State v. Stroger, 97 N.J. 391, 410 (1984), cert. den. 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 974 (1985); In re Barnert Memorial Hospital Rates, 92 N.J. 31, 39 (1983); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561 (1978); Lower Main Street Assoc. v. HMFA, 219 N.J. Super. 263, 272 (App.Div. 1987), certif. granted 109 N.J. 47 (1987); D.S. v. East Brunswick Tp. Bd. of Ed., 188 N.J. Super. 592, 598 (App.Div. 1983), certif. den. 94 N.J. 529 (1983). I see this simply as just such a case involving judicial relief of a wholly unexceptionable nature.
My colleagues are concerned, as am I, that we accord due respect to the principles of separation of powers and that we consequently refrain from intruding into areas of governmental decision-making which are the proper concern of the other branches. I do not, however, believe that my position constitutes such an intrusion. Of course it is beyond our competence to instruct the Legislature to appropriate funds. And it is certainly beyond our competence to tell a Department head how to allocate the resources appropriated to him. But I do not concede that we do either by declaring a statutory mandate to shelter the homeless. I see the matter rather as the Massachusetts Supreme Court did in Coalition for Homeless v. Secretary, 400 Mass. 806, 511 N.E.2d 603 (1987). That was an action brought, among other purposes, to compel the Department of Public Welfare (DPW) to provide AFDC recipients who had resided in hotels, motels, or emergency shelters for more than ninety days with nontransient housing either by way of subsidized housing or rent subsidies. The Court concluded that the controlling Massachusetts statute imposed a duty on DPW "to prevent, as far as reasonably possible, the use of transient housing by AFDC families." Id. 511 N.E.2d at 613. Recognizing both the financial implications of that holding and the limitations on the "judicial role in assuring compliance with a *534 statutory mandate involving the expenditure of public funds," the court concluded that
the department must reasonably seek to fulfill its obligation with such funds as are available for the purpose. If funds appropriated for the purpose are insufficient or if there are no such appropriated funds, the department should advise the Legislature and either seek an appropriation to cover the apparent deficiency or request the Legislature to take some other action that will eliminate the problem. [Id. 511 N.E.2d at 614]
This comports with the manner in which the courts of this state have traditionally interpreted their role in the tripartite governmental scheme. See, e.g., Texter v. Human Services Dep't, 88 N.J. 376 (1982). And see Right to Choose v. Byrne, 91 N.J. 287 (1982); N.J. Ass'n for Retarded Citizens v. Human Services, 89 N.J. 234 (1982).
I believe also that the position I take here is reinforced by the course of action pursued by the other branches of government since the decision in Maticka was filed in February 1987. As the majority opinion points out, public hearings were first conducted by the Department of Human Services (DHS) on March 19, 1987. The testimony received at these hearings and at the July 23, 1987 hearings held on the proposed regulation reiterated the themes which have come to inform our present understanding of the current homelessness crises in this state and in this country. In short, the root cause is inadequate affordable housing for low-income families, a problem exacerbated by the shrinkage of the existing market coupled with the withdrawal of public funds, primarily federal, for construction of new affordable housing. This, in tandem with the low level of public assistance for AFDC families, has resulted in the inability of many AFDC families to replace lost housing within a relatively short period of time by their own unaided efforts. Although the ultimate resolution of the homelessness crisis requires an increase in the supply of affordable housing, short-term amelioratives are and must be made available.[1]
*535 Based on these predicates, DHS adopted the present regulation, whose purposes, operation, and effect were explained by a comprehensive Department summary annexed both to the proposed regulation and the regulation as adopted. 19 N.J.R. 1171 (1987), 19 N.J.R. 2190 (1987). The regulation represents, as the majority points out, a radical expansion of the previous concept of emergency assistance. Thus, it substantially broadens eligibility criteria. It recognizes that emergency assistance should be available both to avert the emergency and to assist in the financing required to obtain permanent replacement housing. And, not least significantly, it implements the well understood necessity for a variety of support services if AFDC families are to be quickly and effectively relocated. It retains, however, the three-month time limit subject, however, to a fourth and, if necessary, a fifth month if "at the end of the third month for which EA has been provided permanent shelter has not been secured." N.J.A.C. 10:82-5.10(d)(1)(vii).
The Department has on a number of occasions since its proposal of the new regulation undertaken to explain its decision to retain a time limitation. The decision seems to be predicated on the fact that historically, and to a large measure currently, the form which emergency shelter assistance takes is payment for welfare hotel or motel accommodation. As so predicated, there can be no rational dispute of the Department's perception that unlimited emergency assistance is both unconscionably costly and wholly unsatisfactory as a shelter alternative *536 for the families so housed.[2] A corollary perception is that without the time limit the welfare-hotel alternative to homelessness would become a permanent or quasi-permanent solution which would divert both funds and attention from more effective short-term as well as long-term solutions.[3] Overriding these concerns, however, is the Department's evident anticipation, in view of the creative approaches of the new regulation, the resources committed to its implementation, and the development of other programs by it and the Department of Community Affairs (DCA), that the five-month limit would provide an adequate opportunity in which a family receiving emergency assistance could obtain a better alternative. This is the leit motif of all of the Department's articulated expressions.
Thus, in its explanation for the proposed regulation, the Department pointed out that according to the reports of the county welfare agencies (CWAs), 95 percent of emergency assistance cases were resolved in less than 90 days, 52.1 percent within one week, 66 percent within three weeks, and nearly 75 percent within a month. 19 N.J.R. 1173. The ineluctable inference is the Department's expectation that the 5 percent of emergency cases not resolved within the originally allowed 90 days would be resolved during the additional two-month period so that within the total allowable limited period all families on EA would move to some other shelter arrangement. This theme was reiterated by the Department when the regulation was finally adopted, the Department then stating its conclusion "that 90 days plus extended time limitations, when dictated by necessity, is reasonable time to secure permanent housing." 19 N.J.R. 2190 (1987).
*537 As a matter of Department policy, the five-month period for all families receiving EA when the regulation was adopted was to terminate on March 31, 1988. Prior to that time, Governor Kean in his State of the State message, delivered on January 12, 1988, readdressed the homeless problem, which has continued to be a matter of intense executive concern. He said
Rising housing costs and fewer rentals mean that a growing number of people have nowhere to live. Like chaff from wheat, they are being separated from the successful in our society and scattered by the wind. Some have estimated that more that 25,000 New Jerseyans are homeless today, living in doorways, car frames, motels and temporary shelters. Contrary to popular perception, these are not shiftless vagabonds. Eighty percent of the homeless are families down on their luck.
The permanent answer to homelessness is affordable housing. But our homeless cannot wait for zoning approvals, bulldozers and concrete mixers. We must meet their needs today.
Noting the expansion of both the homelessness prevention program and emergency assistance in 1987, he called for even further expansion in 1988 "to help those in danger of falling through the safety net." Significantly, he emphasized alternative approaches and complements to emergency shelter assistance, including the DHS's Comprehensive Emergency Assistance System (CEAS) and the joint demonstration program of DHS and DCA designed to recapture housing by rehabilitating abandoned structures. And finally, the Governor acknowledged the significance of the July 1987 passage by Congress of the Stewart B. McKinney Homeless Assistance Act, P.L. 100-77 pursuant to which New Jersey had "already received 7 million dollars in funding for homeless programs" and expects "to receive millions more."[4]
On the legislative front, the Assembly, on January 28, 1988, two weeks after the State of the State message, adopted *538 Resolution No. 63, which called upon the DHS Commissioner Drew Altman to make a prompt report to the Legislature respecting the effect of the new regulation together with "any recommendations which he may have for legislative action that he deems necessary or expedient to render the program of emergency assistance more effective, efficient, or equitable." The reason for this direction is explained in the Resolution's Preamble as follows:
WHEREAS, In response to Maticka v. City of Atlantic City, 216 N.J. Super. 434 (1987), a decision which stressed that governmental responsibility to assist persons rendered homeless must be administered on a basis of realistic assessment of the capability of such persons, in each individual case, to help themselves, the Department of Human Services has adopted new regulations, effective November 16, 1987; and
WHEREAS, The new regulations significantly relax the conditions upon which persons rendered homeless may obtain emergency assistance, but continue to limit the receipt of such assistance to a period of 90 days, except for the possibility of one or two 30-day extensions in certain cases; and,
WHEREAS, The expiration of the first 90-day period from the effective date of the new regulations is near at hand; and,
WHEREAS, It is of intense concern to the Legislature to ascertain whether the provision made for emergency assistance to homeless persons and families be adequate for their needs and efficient in its administration, inasmuch as it is the duty and responsibility of the Legislature to establish a sound basis in law for the provision of such services; ....
The next series of developments occurred in March 1988, again legislatively inspired. By March 7, 1988, the DHS Commissioner had not yet filed the report requested by the Assembly. The Assembly was nevertheless aware of the impending March 31, 1988 deadline on emergency assistance. It was also evidently aware that the deadline spelled disaster for the still unrelocated EA recipients. Consequently, based on the "intense concern to the Legislature to provide sufficient emergency assistance to homeless persons and families," the Assembly, on March 7, 1988, adopted Resolution No. 85, mandating the continuation of emergency housing assistance for an additional month, namely, until April 30, 1988. Section 1 of the Resolution reads as follows:
The Commissioner of the Department of Human Services, being the administrator responsible for implementing and operating homeless programs for the *539 department, and the Governor, having the statutory power to concur in the emergency adoption of administrative rules, are mandated to take immediate steps to extend payments for housing assistance for an additional month until April 30, 1988 for those recipients whose participation is to end as of March 31, 1988 under the Emergency Assistance Program.
The Legislature took two additional actions on March 7, 1988. It passed Senate Bill No. 88 (substituting for Assembly Bills No. 2494 and 1511), and it passed Assembly Bill No. 2495, both of which await gubernatorial signature. Together, the bills appropriate an additional $13,700,000 for assistance for the homeless.
Three days later, on March 10, 1988, Commissioner Altman delivered his report to the Legislature. It has been extensively quoted from by the majority. My focus is on the Commissioner's eloquently expressed concern that emergency assistance in the form of unlimited welfare motel payments not be permitted to become a long-term solution to homelessness. His emphasis was on the need to provide more productive, humane, and economic alternatives by which the homelessness problem can be reasonably addressed until a supply of affordable housing is available. The report consequently described the "programs the Department will undertake" as including an Emergency Housing Assistance Program (EHAP) in conjunction with DCA to convert abandoned buildings into emergency and low-income housing units, a transition apartment program to reduce reliance on hotels and motels, the possibility of designating nonprofit community providers to function as formal designees of the state to receive matching federal funds, implementation of the Governor's proposed Homeless Case Management Program, and additional funding for the CEAS program. This last, the Commissioner explained, will provide "a `safety net' for those who exhaust, or do not qualify for other programs of service to the homeless." In short, as I read the import of the Commissioner's report, an unmistakable message emerges. The message is not that homeless families on EA will be put out on the streets when the time limit for EA is exhausted. The message rather is that if continued residence in welfare motels is no *540 longer an option, public assistance funding sources and public assistance administrators on all levels, assisted by other public officials and nonprofit organizations, will be forced to produce and will be able to produce creative, intelligent, economically viable and socially responsible alternatives, at least as a stop-gap until the stock of affordable housing is increased. The problem, of course, is that this has not yet happened and at this moment there is no safety net.
I consider the balance of the chronology of recent events in the light of what thus appears to me to be the Commissioner's guiding thesis. On the day after the delivery of the Commissioner's report to the Legislature, DHS issued its County Homelessness Assistance Grant Program Guidelines in contemplation of the imminent approach of the March 31, 1988 deadline and apparently independently of Assembly Resolution 85. The Guidelines explain the problem addressed as follows:
The emergency assistance program is intended to provide emergency, time-limited assistance to individuals eligible for AFDC. It is not intended, and cannot be, the solution to the low-incoming housing problem.
Additionally, dealing effectively with homelessness requires a partnership among all levels of government; the job is impossible for any one level of government or agency to handle alone.
Many counties efforts over the past several months have demonstrated that emergency assistance can function as it was intended  to assist AFDC families to cope with time-limited emergencies. There has been a unique situation, however, created by the implementation of new regulations on November 1, 1987.
The Departments of Human Services and Community Affairs, therefore, have joined together to provide support to the counties to assist in this unique situation for those families exhausting their maximum entitlement (5 month) to Emergency Assistance (EA) payments on March 31, 1988. There will be a one-time, one month extension of EA for those families.
In addition to the EA extension, the Guidelines announced a one million dollar funding to be distributed to the counties "to be utilized by the CWA in the manner in which it considers most effective in addressing the needs of its eligible population." The Guidelines further explained that
Examples of use could be
 Rental subsidies.
 Home finding programs.

*541  Development and/or expansion of shelter facilities utilizing governmental or nonprofit groups.
 Development of community based organizational responses for long and short term solutions.
 Shared living arrangements with other families.
 Continued payments for temporary shelter.
In order to facilitate the placement of such families in permanent housing, it is recommended that the counties consider a time-limited rental subsidy program established by the DWA with a twelve month maximum.
Moreover, CWAs were cautioned that they
are expected to develop strategies designed to ensure that all families exhausting their five month EA entitlement at the end of March 1988 are assisted to the maximum extent possible in the resolution of their housing crisis by acquiring permanent housing rather than temporary living arrangements. This effort will obviously entail a major commitment to provide any and all necessary support services to the families to successfully address their housing problems.
We come now to March 31, 1988. On that date the Governor approved the Commissioner's emergency amendment of the regulation extending EA for a sixth month. Three days earlier Commissioner Altman had testified at a joint Congressional hearing of the Senate Finance Subcommittee on Social Security and Family Policy and the House Ways and Means Subcommittee on Public Assistance and Unemployment Compensation. He reiterated his themes that more low-income housing must be provided, that "Congress must enact welfare reform to address the broader income-related needs of public assistance recipients," that welfare motels are an unacceptable long-term solution, and that the emergency assistance program must be rethought and restructured to provide federal funding for more flexible state approaches, including the use of emergency assistance funds for permanent housing purposes.
We are almost up to date. The one-month extension was due to expire on April 30th. On April 27, 1988, this court denied appellants' motion for a stay of that expiration. On April 28, 1988, the DHS issued a press release announcing "a package of initiatives to assist counties in placing families who are temporarily housed in welfare motels in living arrangements." The release explained that "[t]hese steps, developed as an alternative to a further extension of emergency assistance, is in *542 response to the fact that a number of families who receive Aid to Families with Dependent Children (AFDC) will exhaust their Emergency assistance (EA) benefits on April 30th." While it was cautioned that the package not be construed as a further extension of emergency assistance, it included these components:
1. A one-time transitional million dollar funding to the counties to allow them
to maintain families who will exhaust their benefits on April 30th in hotels or motels. This will be at county option and will not preclude counties from using these funds to make alternative interim arrangements if they so choose. The Department will be supplying funds to counties based on how many families are exhausting their emergency assistance benefits on April 30th. The purpose of this funding is to give counties more time to use the other funding provided in this package of initiatives to place families in better living arrangements.
2. The offer by DHS to nonprofit organizations of the $300 "home-finders fee" for obtaining an "appropriate alternative housing arrangement for a family whose emergency assistance terminates on April 30th."
3. Addition of another million dollars to the County Homelessness Assistance Grant Program, described in the March 11th guidelines for "rental assistance and other measures necessary to place families who have exhausted their emergency assistance benefits."
4. A plan to eliminate the shelter component of the AFDC grant to families while placed in hotels or motels under emergency assistance, a move expected to provide an additional three million dollars for the County Homelessness Assistance Grant Program.
5. The undertaking by DHS of cooperation with county governments and nonprofit organizations "to find the most appropriate way to support the expansion of family shelters in New Jersey to accommodate those who exhaust their emergency assistance benefit without securing permanent housing."
The Commissioner is quoted by the release as asserting that "this package of initiatives deals with both the immediate and long-term needs of this population. It fills the gap between *543 emergency assistance and alternative housing arrangements by providing funds to the counties." Thus, the Commissioner concluded
Our commitment to family shelters and long-term funding to the counties should provide a base to eliminate our reliance on emergency assistance as well as hotel and motel placement  the absolute worst arrangements we can make for homeless families.
The gap, if filled at all, was thus filled for only 30 days, and on May 3, 1988, the Supreme Court granted its own 30-day stay of the time limit on emergency shelter assistance. We heard oral argument on May 17, 1988 and were then told that as a result of the creative initiatives of DHS and their aggressive implementation at the local level, the number of unplaced families who had then exhausted EA benefits had been reduced from 940 to 463. We do not know how many additional unplaced families there are who will have exhausted five months of EA benefits on May 31, 1988, and we cannot know how many there will be in the future, and we have been given no projections. It is, of course, these 463 families and any such families there may yet be who command our attention.
I would think that the point of this recitation of the executive, administrative, and legislative response is clear. It demonstrates what I believe to be a profound commitment by these branches of government to devote the necessary resources of government to sheltering the homeless. It also suggests that the extent of this commitment is such that these branches of government will ultimately act within the scope of their power to avert the catastrophe which lies at the brink for these families. I do not believe, however, that that prediction absolves the judiciary from acting within the proper scope of its jurisdiction as well. Thus, if the Supreme Court's stay were lifted today, the time-limited regulation, except as may have been modified by uncodified DHS instructions issued in accordance with the press release, would dictate that the families who have exhausted their benefits would be out on the streets. Having concluded that these families have a statutory right to some form of temporary shelter, I could not in conscience *544 consign them either to that fate or to the fear of that fate or, in addition to all their other troubles, to the repeated anxiety of awaiting yet another last-minute reprieve.
There is a great deal of encouragement to be found in this record. The Commissioner's creative activism in the last months coupled with heroic efforts by a number of nonprofit organizations forcefully demonstrates how much progress can be achieved in placing homeless families even under present rental market conditions. No one can argue with his view of welfare motels, and clearly, his determination to find other ways to shelter the homeless, both temporarily and permanently, is an effort which must be supported. But the fact is that despite the recent intensive activity of DHS and local agencies, those other ways are not yet in place for a large but by no means unmanageable number of families. We must do for them in the meantime, and a motel room, if that is all there is, is still better than nothing at all. The point, of course, is that none of these families is disposable. It may well be that sometime in the future  and perhaps not too far in the future  enough of these plans, projects, and programs will be in place to assure that a limited time period will realistically suffice for the obtaining of alternate shelter.[5] That time has evidently, however, not yet come.
One final word about welfare motels. The equation of emergency assistance with that form of shelter is historical and empirical  not conceptual. That was apparently the method used when the homelessness problem was relatively minor and replacement housing not so inaccessible. It may have worked then. It does not work with a homelessness problem of present dimension and a housing market which is so difficult. It is thus not the concept of emergency assistance to which I understand *545 the Commissioner to object but the historical and empirical form it has taken but need not continue to take. The form which emergency assistance takes is subject to administrative design and discretion. The Commissioner is its ultimate architect.[6]
It is also clear to me that the homeless families relegated to welfare-motel existence, the ones who live in these "worst possible arrangements," have not voluntarily chosen to do so and are indeed the most eager of all for something better. But this record also makes clear that the realistic prospects of these families to move on from welfare motels to more appropriate housing depends in substantial measure on the financial and other support services which are made available to them. They themselves typically have neither the money, the transportation, the skill, the experience, the contacts, nor the freedom from child care necessary to conduct a meaningful housing search. The more support services they receive from the CWA's and others working on their behalf, the more quickly they will locate housing. In a real sense, therefore, DHS and the local agencies have greater control over the length of the motel stay than do the residents. The more meaningful assistance they are given to move on, the more quickly they will be able to do so and at considerable saving in human and financial costs. The rendering of that assistance ought not to depend on whether the Damoclean sword of the five-month limit is swinging or not. Ultimately, the point remains that DHS is free to develop any reasonable program. It is not free to do nothing once EA has been exhausted. And that is the present regulatory posture.
Having concluded that the time limitation is invalid as violative of the statutory mandate, I need not address the constitutional *546 claims rejected by the majority. I have, however, a somewhat different doctrinal view which, while not raised by the parties, seems to me to be of pertinence. In N.J. Ass'n for Retarded Citizens v. Human Services, 89 N.J. 234 (1982), the Supreme Court mandated compliance by the Department of Human Services with the statutory mandate for provision of the educational, training, and rehabilitative services for mentally retarded residents of a state facility. In concluding the opinion, Justice Pashman observed that, "In this State, we do not set people adrift because they are victims of misfortune. We take care of each other." Id. at 252. In my view that statement is not simply an ethical expression. It also encapsulates what I think the doctrine of parens patriae is about and what it demands. As explained by Justice Heher in his dissenting opinion in Borawick v. Barba, 7 N.J. 393, 410-411 (1951), the doctrine is based on the "prerogative of the Crown, arising from its general duty as parens patriae to protect persons who have no other rightful protector"  those who are infants, disabled, incompetent, or otherwise helpless. It was a prerogative exercised by the Chancellor of England as the King's representative in foro conscientiae  the forum of conscience. The parens patriae jurisdiction is historically that of the court of equity, deriving from the sovereign's obligation, and it has been traditionally exercised in this state for the protection of those who cannot help themselves. See, e.g., Fantony v. Fantony, 21 N.J. 525 (1956); In re Hannah Barry, 61 N.J. Eq. 135, 137 (Ch. 1900), Seaboard By-Products Co. v. Luszcs, 100 N.J.L. 54, 56-57 (Sup.Ct. 1924); E. v. T., 124 N.J. Super. 535, 541 (Ch.Div. 1973). The affording of basic protection is to my mind the first and paramount function of government. That proposition is a matter of constitutional imperative. Article I, paragraph 2 of the 1947 Constitution provides in part that "Government is instituted for the protection, security and benefit of the people." Even if this clause were not itself affirmatively to oblige government to act to protect the helpless, it remains nevertheless a reaffirmation of that paramount sovereign obligation *547 from which the court's parens patriae jurisdiction derives. I believe, moreover, that the helplessness of homeless AFDC families whose ultimate recourse is the surrender of the children to foster care while the mother tries to fend for herself in a state of transiency properly invokes the protective jurisdiction of the Court. I deem it profitless to speculate, as the majority does, on how much more might be demanded after minimal shelter sufficient to keep impoverished families together under a roof is provided. I am satisfied that at least that much is demanded of us. It is a need to which we must respond, and I see no principle of governmental structure or allocation of governmental powers which prevents us from so declaring.
I would vote to invalidate the time limitation on the emergency assistance regulation until such time as it can be demonstrated that its effect will not be the creation of a gap through which homeless AFDC families will fall.
NOTES
[1] A third appeal challenging the five month limit on emergency shelter assistance was filed at the same time as these two appeals, Gresham v. Department of Human Services, A-3755-87T5. However, we were advised at oral argument that Gresham had obtained permanent shelter during the pendency of this appeal and hence was no longer in need of emergency shelter assistance. Consequently, we dismissed the Gresham appeal as moot by order dated May 26, 1988. We were also advised at oral argument that four of the appellants represented by the Public Advocate had obtained permanent shelter subsequent to the filing of the notice of appeal in McCurdy.
[2] The original five month maximum period for the receipt of emergency shelter assistance under the new regulation was scheduled to expire on March 31, 1988. However, the Department has extended this expiration date, first to April 30, 1988 and then to May 31, 1988, see 20 N.J.R. 933.
[3] Similar changes were made, effective January 4, 1988, in the regulations governing the EA program for General Assistance recipients, including an increase from three to five months in the maximum period emergency shelter assistance may be provided. See N.J.A.C. 10:85-4.6.
[4] Indeed, the Department of Human Services indicates that it has been notified by the United States Department of Health and Human Services that federal funding will not be available with respect to any emergency shelter assistance provided beyond 90 days. However, the federal regulations implementing the EA program, 45 C.F.R. 233.120, are subject to varying interpretations, and we assume that the Department will pursue all available avenues to secure full federal participation for all aspects of its expanded EA program.
[5] We note that the Legislature has often expansively described the purposes of various governmental programs without appropriating sufficient funds to fully achieve those purposes. For example, although N.J.S.A. 27:25-2(b) declares that "it is the responsibility of the State to establish and provide for the operation and improvement of a coherent public transportation system in the most efficient and effective manner," there continue to be shortcomings in the state's public transportation system due to insufficient appropriations.
[6] We also note that acceptance of appellants' arguments in this case would have ramifications far beyond emergency shelter assistance to avoid homelessness. The objective of AFDC set forth in N.J.S.A. 44:10-1(a)(1) is "[t]o provide for the care of eligible children in their own homes or in the homes of relatives, under standards and conditions compatible with decency and health." Surely, achievement of these objectives would require not only shelter but also food, clothing, medical care and other vital human needs. Moreover, the reference to "standards and conditions compatible with decency and health" could be easily construed to require a certain qualitative level of benefits; for example, not only "shelter" but "adequate shelter" and not only "food" but "nourishing food." See Massachusetts Coalition for the Homeless v. Security of Human Services, 400 Mass. 806, 511 N.E.2d 603, 612-614 (Sup.Jud.Ct. 1987). We do not mean to denigrate the importance of these needs of AFDC recipients; to the contrary, all parties to these appeals agree that every effort should be made to satisfy them. However, we make these observations to demonstrate the breadth of appellants' arguments.
[7] The number of families whose emergency shelter assistance is subject to termination due to expiration of the five month limit is constantly changing, as some families whose EA is scheduled to expire find permanent shelter and others reach the end of the five month period for receipt of EA. In his March 10, 1988 report to the Legislature, the Commissioner of Human Services reported that there were 940 families whose emergency shelter assistance was scheduled to terminate as of March 31, 1988. At the oral argument before us on May 17, 1988, the Assistant Attorney General representing the Department indicated that there were 463 families whose emergency shelter assistance was scheduled to terminate.
[8] This court similarly observed in Matter of Petitions for Rulemaking, supra, that:

Since 1971 neither inflation nor actual need has been a factor in the New Jersey standard of need. Id. [New Jersey Welfare Rights Organization v. Cahill, 483 F.2d 723] at 726 [(3d Cir.1973)]. The consequence has been that by 1987 despite a 176% increase in the consumer price index, AFDC benefits, taking into account both cash allotment and food stamps, have increased only 77% in New Jersey. A study conducted by the National Social Science and Law Project showed that in 1985 the New Jersey monthly payment together with the maximum food stamp allotment for a family of four covered only 46% of the family's actual basic needs. [223 N.J. Super. at 458].
[9] Appellants do not dispute the Department's representations that the combined effect of the stay of the prior EA regulations granted in Maticka and the liberalization of EA eligibility criteria and benefits in the new EA regulation have caused a deficit of approximately $15,000,000 in the EA appropriations for the current year. In addition, the Commissioner of Human Services estimates that the elimination of any time limit on emergency shelter assistance would add another $20,000,000 to EA expenditures, thereby increasing the deficit in the EA program. These dire fiscal forecasts would be subject to downward revision to the extent other legislative programs addressed to the problem of homelessness, referred to elsewhere in this opinion, succeed in their goals.
[10] The only change in the 1947 Constitution was the substitution of "persons" for "men" in Article I, paragraph 1. There was no change in Article I, paragraph 2.

There were several proposals made at the 1947 Constitutional Convention to include a specific provision in the New Jersey Constitution regarding public welfare. See III Proceedings of the New Jersey Constitutional Convention of 1947, Appendix, Recommendations of the League of Women Voters, at 360-361; II Proceedings, supra, Delegate Proposal No. 41, at 1020-1021; II Proceedings, supra, Delegate Amendment No. 12 to Proposal 2-1 of the Committee on the Legislative, at 1093. All of these proposals were merely permissive; they would have authorized legislation to address the problems of the needy, but not mandated any form of public assistance. For example, the relevant part of proposal no. 41 was as follows:
Nothing in this Constitution shall prevent the Legislature from providing as it may deem proper by general laws:
For the aid, care and support of the needy;
* * * * * * * *
For health and welfare services for children and the needy;
For the aid, care and support of neglected and dependent children and of the needy, ... [II Proceedings, at 1021].
[11] The first sentence of the second paragraph to the Declaration of Independence states, in language similar to Article I, paragraph 1, that:

We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.
The Virginia Declaration of Rights states, in language even more similar to Article I, paragraph 1:
I. That all men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety. K.M. Rowland, The Life and Correspondence of George Mason, 438-439 (1964).
The second sentence of the second paragraph of the Declaration of Independence states in part, in language similar to Article I, paragraph 2, that:
That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, that whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government....
And the Virginia Declaration of Rights declares in pertinent part that:
II. That all power is vested in, and consequently derived from the people; ...
III. That government is or ought to be, instituted for the common benefit, protection, and security of the people, ... and that when any government shall be found inadequate or contrary to these purposes, a majority of the community hath an indubitable, unalienable, and indefeasible right, to reform, alter, or abolish it, in such manner as shall be judged most conducive to the public weal. Rowland, supra, at 439.
[12] Although the Public Advocate also relies upon Article I, paragraph 2, he does not cite any case law to support his argument under this provision.
[13] As an alternative to her statutory rationale, our dissenting colleague proposes the novel theory that the doctrine of parens patriae imposes an affirmative obligation on the government to provide shelter to AFDC families, and that Article I, paragraph 2 of the New Jersey Constitution makes that obligation a matter of "constitutional imperative." Preliminarily, we note that appellants have not relied on the doctrine of parens patriae in support of their constitutional arguments. Consequently, the State has been deprived of any opportunity to respond to this theory and this court has been denied the benefit of an adversarial presentation. This is the reason that courts ordinarily do not consider arguments sua sponte that have not been briefed or argued by the litigants. See Planned Parenthood of New York City v. State, 75 N.J. 49, 55 (1977). In our view, this principle of judicial restraint should be adhered to in the present case, which involves the validity of a component of one of the State's major public welfare programs. In any event, we find the dissent's theory to be insupportable. The doctrine of parens patriae relates to the jurisdiction of the chancery courts over private disputes relating to the welfare of children and incompetents. Thus, of the cases cited by the dissent, Fantony v. Fantony, 21 N.J. 525 (1956) and E. v. T., 124 N.J. Super. 535 (Ch.Div. 1973) involved child custody disputes between parents, and In re Hannah Barry, 61 N.J. Eq. 135 (Ch. 1900) and Seaboard By-Products Co. v. Luszcs, 100 N.J.L. 54 (Sup.Ct. 1924), rev'd on other grounds, 101 N.J.L. 170 (E. & A. 1925), involved claims on behalf of children to support from private funds. However, none of the cases cited by the dissent, or any other authority we have been able to locate, suggests that the parens patriae doctrine encompasses any affirmative governmental obligation, independent of statute, to furnish support at public expense for any class of its citizens. In fact, one commentator has stated that "according to our system of government, the power of parens patriae belongs exclusively to the legislature of each state, and is not possessed by the courts." 4 Pomeroy's Equity Jurisprudence (5th ed. 1941) § 1304 at 870 n. 14. Therefore, even if Article I, paragraph 2 incorporated the doctrine of parens patriae, this could not affect the validity of the EA regulations challenged on this appeal. Moreover, as described in the text of this opinion, Article I, paragraph 2 is purely an affirmation of the basic democratic principle that the people retain the right to change their form of government by constitutional amendment. See Jackman v. Bodine, 43 N.J. 453, 470-471 (1964); Dickinson v. Fund for Support of Free Public Schools, 187 N.J. Super. 224, 250 (App.Div. 1982), mod. on other grounds, 95 N.J. 65 (1983); see also The City Affairs Committee of Jersey City v. Jersey City, 134 N.J.L. 180, 191 (E. & A. 1946); Hudspeth v. Swayze, 85 N.J.L. 592, 608 (E. & A. 1913). It was not intended to confer any constitutional rights upon individuals. See The State v. Post, 20 N.J.L. 368, 375 (Sup.Ct. 1845), aff'd o.b. 21 N.J.L. 699 (E. & A. 1848).
[1] As to the level of AFDC relief, see In the Matter of Petitions for Rule Making in N.J.A.C., 223 N.J. Super. 453 (App.Div. 1988). As to the problem of homelessness generally in New Jersey and insofar as its legal implications, see, e.g., Craig, Housing the Homeless, 16 N.J.Reporter 15 (Nov. 1986); Chackes, Sheltering the Homeless: Judicial Enforcement of Governmental Duties to the Poor, 31 Wash.U.J. of Urb. & Contemp.Law (1987); Siebert, Homeless People Establishing Rights to Shelter, 4 Law & Inequality 393 (1986); Building a House of Legal Rights: A Plea for the Homeless, 59 St. John's L.Rev. 530 (1985); Langdon and Kass, Homeless in America: Looking for the Right to Shelter, 19 Colum.J.Law & Soc.Prob. 305 (1985). And see Jacobs, Homeless  Their Social, Economic and Legal Status  United States and Great Britain; A Selective Bibliography, 41 Record of the Ass. of the Bar of the City of N.Y. 526 (1986).
[2] In a press release dated April 28, 1988, referred to hereafter, the Commissioner describes welfare motel residency as the "absolute worst arrangements we can make for homeless families."
[3] Commissioner Altman made this statement in his March 10, 1988 Report to the Legislature, referred to hereafter.
[4] The federal Homeless Assistance Act appropriates 15 million dollars for fiscal year 1987 and 124 million dollars for fiscal year 1988 to meet its objectives of aid for the homeless (§ 322). Instructive as to its intent and operation is its extensive legislative history. 7 U.S.Cong.News 362 (1987). See also the National Board Plan for carrying out the Emergency Food and Shelter Program, 53 Federal Register 7024 (1988).
[5] We note also the efforts of local agencies to assist AFDC families in locating housing, the rental costs of which are in part federally financed by so-called section 8 subsidies. See 42 U.S.C.A. § 1437, originally enacted as Housing Act of 1937, § 8. The record suggests that many of the awarded section 8 certificates lapsed because of unavailable housing.
[6] I assume that to some degree welfare motels are resorted to because of the comparative ease of federal reimbursement under the EA program. I gather from the record, however, that reimbursement claims will be made by the State in the fullest amount possible for all of its EA initiatives.